UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BATSHEVA SHOHAM<br>individually and as administrator to:<br>ESTATE OF YEHUDA SHOHAM<br><br>Plaintiffs<br><br>v.<br><br>*FOREIGN STATE DEFENDANTS:*<br><br>ISLAMIC REPUBLIC OF IRAN<br><br>THE SYRIAN ARAB REPUBLIC<br><br>*AGENCIES AND INSTRUMENTALITIES OF*<br>*ISLAMIC REPUBLIC OF IRAN:*<br><br>THE ISLAMIC REVOLUTIONARY GUARDS<br><br>AL QODS FORCE (A\K\A AL QUDS FORCE)<br><br>MINISTRY OF INFORMATION AND SECURITY<br><br>AYATOLLAH ALI HOSEINI-KHAMENEI<br><br>MAHMUD AHMEDINEJAD<br><br>ALI AKBAR HASHEMI RAFSANJANI<br><br>GENERAL MOHAMMAD ALI JA'AFARI<br><br>GENERAL QASEM SOLEIMANI<br><br>NATIONAL PETROCHEMICAL COMPANY<br><br>NATIONAL IRANIAN OIL COMPANY<br><br>ISLAMIC REPUBLIC OF IRAN SHIPPING LINES<br><br>IRAN AIRLINES | Civil Action No. |

1

**BANK MELLI**                                      )
                                                    )
**BANK SEPAH**                                      )
                                                    )
**BANK SADERAT**                                    )
                                                    )
*AGENCIES AND INSTRUMENTALITIES OF*                 )
*THE SYRIAN ARAB REPUBLIC:*                         )
                                                    )
**BASHAR AL ASSAD**                                 )
                                                    )
**THE REAL ESTATE BANK OF SYRIA**                   )
                                                    )
**THE COMMERCIAL BANK OF SYRIA**                    )
                                                    )
**Defendants**                                      )

## COMPLAINT

Plaintiff Batsheva Shoham by  undersigned counsel brings this Complaint, against the Islamic Republic of Iran ("Iran"), its officials, employees, agents, instrumentalities, and/or subdivisions and The Syrian Arab Republic ("Syria"), its officials, employees, agents, instrumentalities, and/or subdivisions ("hereinafter agents and instrumentalities"), jointly and severally, and allege as follows:

1.      This action is brought by Plaintiff for the wrongful death and serious injuries suffered as a result of a terror attack that was authorized, directed and/or carried out by the Al-Aqsa Martyrs Brigade *a/k/a Al-Aqsa Martyrs Battalion, Tanzim, Fatah-Tanzim, and Fatah AAMB* ("AAMB") who, upon information and belief, were directed, commanded, incited, provided with material and logistics support and/or resources by Defendants including financial, cover, sanctuary, technical assistance, safe harbor, weapons, explosive devices, recruitment, indoctrination, incitement and training. At all times relevant hereof, the Islamic Republic of Iran and The Arab

2

Republic of Syria were designated state sponsors of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)).

2.      This Complaint is being filed pursuant to an order by the District Court of D.C.  dated February 28, 2012, which severed Batsheva Shoham  claims (and others) from an  original Complaint filed June 9, 2011 entitled  Benyamin Pilant et al. v. Islamic Republic of Iran et al., Case No. 1:11-cv-01077-RMC. The order allowed for the refiling of a new complaint on behalf of Batsheva Shoham within thirty days, that would relate back to the filing of the original complaint entitled Benyamin Pilant et al. v. Islamic Republic of Iran et al.,  Case no. 1:11-cv-01077-RMC.

## INTRODUCTION

3.      The Plaintiff is a United States citizen who was a victim of a terror attack,  which targeted innocent civilians living in Israel.

4.      The murderous attack, of terrorism was carried out by the AAMB.  The attack involved the use of a lethal device, which was utilized in a manner to cause the utmost death and bodily harm. The attack involved the intentional delivery, placement and/or discharge of a lethal device in a public place,  which was known to be primarily and/or exclusively used by civilians.

5.      The act of terrorism which was carried out in furtherance of AAMB's campaign of terror was sponsored, supported, financed, incited and directed by and through the Defendants, directly and  indirectly,  jointly  and  severally.   Defendants  knew  that  unarmed,  innocent  civilians, including U.S. citizens and nationals, frequented the places chosen by AAMB for their terrorist attack and that it was in all likelihood and foreseeable that U.S. citizens and nationals would be

killed and/or seriously and permanently injured, terrorized and subjected to extreme mental and psychological trauma in their attacks.

6.      The AAMB is a terrorist organization based in the Palestinian areas of the West Bank and Gaza Strip. The AAMB has been designated as a terrorist organization by the United States, Israel, Canada and the European Union. Since its establishment the AAMB has committed numerous terrorist attacks in Israel, the Gaza Strip, and the West Bank, in which hundreds of civilians were killed and wounded, including U.S. citizens and nationals.

7.      On September 23, 2001 the US Department of State designated the AAMB as a foreign terrorist organization and on October 31, 2001 as a Specially Designated Terrorist Entity. Subsequently, on March 27, 2002, the US Treasury Department designated the AAMB as a Specially Designated Global Terrorist ("SDGT").

8.      The AAMB uses violent means to achieve its goals of establishing an Islamic Palestinian state in place of the State of Israel.

9.      Since the inception of this terrorist organization, their alliance with Iran has been political, financial and military. On the financial level, Iran has provided the AAMB directly and/or indirectly, with hundreds of millions of dollars in funding, annually.   On the military level, Iran has been and continues to be a primary source of weapons and explosives and training of AAMB "military activists" in weapons usage, bomb making, espionage, counter-espionage, clandestine communications, and ambush preparation using IED's on Iranian and Lebanese territory.

10.    To carry out its policy of terrorism and support for terrorist groups, Iran has created and used its government-controlled organizations, (so-called "charitable" foundations) and government owned businesses, as well as its intelligence ministry and its military, and other

entities which are part of the government and are directly answerable to and receive instructions from the regime in power (lead by Defendant Supreme Leader Ayatollah Khamenei).

11.    Iran's financial sponsorship of the AAMB is largely through the funding it receives from its state-owned and controlled businesses. Iran utilizes Defendants' businesses and cut-out entities in multiple countries to create complex, multi-layered structures to siphon revenues and launder monies provided to AAMB and to transport weapons and material to those AAMB terrorist cells.  Iran's logistical, military and intelligence support to AAMB comes through its dominant military branch - the Iranian Revolutionary Guards Corps (IRGC), Iran's Ministry of Intelligence and Security (MOIS) and its various ministries, whose senior officers both past and present have significant ties to the IRGC.  (See, *Salazar v. Islamic Republic of Iran*, 370 F.Supp. 2d 105, 116 (D.D.C. 2005) (analogizing the IRGC to the Ministry of Intelligence and Security Information (MOIS) for purposes of liability, and concluding that both must be treated as the state of Iran itself).

12.    Similar is the relationship between AAMB and Syria. Syria carries out its proxy war against Israel using terrorist entities such as the AAMB to execute its terrorist attacks.  Almost from its establishment, Fatah (the mother organization of the AAMB) has received continuous and substantial political, military and financial support from Syria. Syria has hosted military/terrorist training camps for recruits of the AAMB, using Syrian army basis and facilities. Syria has provided safe-haven for terrorists and regularly allows weapons used directly and indirectly by the AAMB to pass through Syria with government knowledge and help (as well as allowing weapons and terrorists to pass through Syria to attack US civilians and military personnel in Iraq).  Syria has authorized the funneling of financial support to Fatah/AAMB cells from and through Syria. Syria has invited terrorist leaders to fundraise in Damascus and has

hosted meetings between various terrorist groups, including Hezbollah (a/k/a Hizballah, Hizb'allah), PIJ, Hamas, and Iran all of which contribute to AAM'Bs terror apparatus to some degree  Syria's government ministries have worked in conjunction with AAMB and used its military intelligence to provide weapons and logistical support for coordinating, planning and executing terror attacks against Israel and its population from the safety of Syrian soil. Syria has used its banking system to launder money for terror groups including the AAMB and to support terrorist entities financially by setting up "charities" to provide funding for these entities.  The Syrian regime has been a key factor in the terror axis of Iran, Syria and Hamas, PIJ and the Fatah/AAMB.

13.    All of the defendants named in the Complaint have played key roles either directly or indirectly, in materially supporting AAMB's infrastructure and its terrorist activities, financially, politically, logistically and militarily, thereby enabling these agents of defendants to carry out the vicious terror attack against Plaintiff.

## JURISDICTION AND VENUE

14.    Plaintiff brings this action pursuant to the Torture Victims Protection Act of 1991 ("TVPA") P.L. 102-256 and the laws of the jurisdiction of the residence of the Plaintiff.[1]

15.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1330(a), 1331, 1332(a) (2); and 28 USC 1605A or in the alternative 1605(a)(7).

16.    This court exercises in personam jurisdiction over the parties designated as Defendants pursuant to 28 USC Section 1605A or in the alterative 28 USC 1605(a)(7).

17.    Plaintiff is a U.S. citizen.

18.    Defendants are subject to suit in the courts of the United States pursuant to  28 U.S.C. §1605A, an exception to the Foreign Sovereign Immunities Act allowing suit against foreign

state sponsors of terror, for extrajudicial killings and other terrorist actions committed by said states and their agents. The FSIA has been construed to apply to individuals (officials, employees, or agents of a foreign state designated as a state sponsor of terrorism) for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality. *Flatow v. Islamic Republic of Iran,* 999 F. Supp 1 (D.C. 1998) and 28 U.S.C. §1603.[2]

19.    Plaintiff brings this action against Defendants Syria and Iran and their agencies, instrumentalities and subdivisions so as to assert a cause of action under the FSIA, 28 U.S.C. §1605A and TVPA including wrongful death, assault and intentional infliction of emotional distress resulting in damages for loss of solatium/consortium and/or loss of services, and such other monetary and equitable relief.[3]

20.    Plaintiffs bring their claims within 28 U.S.C. §1605A(c)(2)'s statute of limitations.

21.    Venue in this Court is proper in accordance with the provisions of 28 U.S.C. §1391(f)(4), which provides in pertinent part that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.[4]

**PARTIES**

**PLAINTIFF**

22.    Plaintiff Batsheva Shoham is a US citizen. She currently lives in Israel with her husband Benjamin Shoham and her minor children Shmuel, Lea, Chaim and Moshe Shoham.

---

[1] The place of residence of Plaintiff is Israel.
[2] The definition of "foreign state" pursuant to FSIA 28 USCS § 1603 includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state. See *Foremost-McKeeson,* 905 F.2d at 446 (quoting -*Elahi v. Islamic Republic of Iran,* 124 F. Supp. 2d 97, 108 (D.D.C. 2000).
[3] See, *Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 56 (D.D.C. 2008).
[4] Jurisdiction is proper as to the defendants who are not a foreign state or instrumentality based on diversity of citizenship.

23.    On June 5, 2001, Batsheva and Benjamin Shoham were ambushed by two AAMB members, who unprovoked, threw stones and rocks at the vehicle of the young couple as they were driving on a public road near Shilo in the West Bank, just minutes from their home.  Also, in the vehicle was their first born child, an infant of five months, Yehuda Shoham.  According to the their signed confessions,  AAMB members Muayad Kafina and Saker Saleh admitted to perpetrating the attack, which was designated as an act of terrorism by Prime Minister Ariel Sharon, Israel's Ministry of Foreign Affairs, and by Yehuda Lauery- Permanent Representative to the UN General Assembly Council.

24.    One of the stones, which were described as "the size of a boulder," shattered the windshield and hit five-month old Yehuda Shoham. As a result, Yehuda Shoham was critically injured sustaining a blunt head injury and brain edema.  After a week of hospitalization, wherein Yehuda Shoham endured serious pain and suffering, being hooked up to a life support machine, Yehuda died on June 11, 2001 in the hospital with his parents by his side.

25.    Yehuda Shoham was the firstborn child of plaintiffs Batsheva and Benjamin Shoham and the brother of Shmuel, Lea, Chaim and Moshe Shoham.

26.    As a result of the Plaintiff's experience of violence aimed at herself, her husband and her child, and witnessing the sight of her child suffering from his critical injuries and his subsequent death, Batsheva Shoham experienced serious emotional and psychological trauma, that has affected her daily life including her marital and family life and her employment capability.

27.    To this day Batsheva Shoham continues to suffer from the trauma of violently losing her first born child.

28.    Plaintiff Batsheva Shoham is a US citizen and is the mother and the administrator of the Estate of Yehuda Shoham.

29.    The Plaintiff's injuries and trauma were caused by the willful and deliberate acts of terror by the AAMB who were acting under the direct and indirect sponsorship and/or direction and/or agency of the named Defendants, who provided material support to AAMB to enable them to carry out the attack on the Plaintiff and her family.

30.    The actions of the agents and co-conspirators of the Defendants as set forth below, and those who were substantially aided and abetted by Defendants, inflicted serious injury and mental distress upon the Plaintiff and her family.

**DEFENDANTS**

**FOREIGN STATES**

31.    Defendant, the Islamic Republic of Iran, is a foreign state which at all times alleged hereinafter was designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)), §620A of the Foreign Assistance Act, 22 U.S.C. §2371; and §40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d).

32.    Pursuant to the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §1602 et seq., U.S. citizens may file lawsuits in federal district court against foreign states so designated as sponsors of terrorism.  Iran maintains an Interest Section at the Embassy of Pakistan, 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

33.    Iran, through its officials, employees, agents and instrumentalities, has financed, supported, directed, encouraged, incited, provided weapons, explosives, training and safe-harbor, contributed, aided and abetted and conspired with the terrorists responsible for the injuries of the Plaintiff in this action.  These individuals and entities, owned and controlled by the Iranian regime, qualify as agents and/or instrumentalities and/or alter egos of Iran within the meaning of

§1603(a) of the FSIA.[5]  As agents and instrumentalities of Iran and senior officers of such instrumentalities, they maintain a presence and/or interest in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, at 622 Third Ave. New York, NY 10017 and/or through the Islamic Republic of Iran  Interest Section within the United States at the Embassy in Pakistan at 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

34.    Defendant Syria is a foreign state designated by the U.S. State Department as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)).

35.    Syria's status as a designated state sponsor of terrorism at all relevant times alleged herein enables U.S. citizen to file lawsuits against it pursuant to the FSIA, 28 U.S.C.S. §1602 et seq. Syria maintains an interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

36.    Syria, through its officials, employees, agents and instrumentalities, has financed, supported, directed, encouraged, contributed, incited, provided weapons, explosives, training and safe-harbor, aided and abetted and conspired with the terrorists responsible for the injuries of the Plaintiff in this action. These individuals and entities owned and controlled by the Syrian regime qualify as agents and/or instrumentalities and/or alter egos of Syria within the meaning of §1603(a) of the FSIA.

37.    As agents and instrumentalities of Syria and senior officers of such instrumentalities, they maintain a presence and/or interest in the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

---

[5] The definition of "foreign state" in the FSIA includes agencies and instrumentalities of a foreign state. See 28 U.S.C. § 1603(a)(b). See also *Foremost-McKeeson v. The Islamic Republic of Iran*, 905 F.2d 438, 446 (DCCir.1990)

## AGENTS AND INSTRUMENTALITIES OF IRAN

38.    The Supreme Leader and head of state, Ayatollah Ali Khamenei is the primary authority in the Iranian government, and yields the ultimate religious power. Khamenei has directly and indirectly incited, encouraged, supported and directed terrorist organizations including the AAMB in their vicious attacks against U.S. citizens, and Israeli and Jewish civilian targets and institutions worldwide. In a December 15, 2000 sermon, Supreme Leader Ali Khamenei declared, "*The cancerous tumor called Israel must be uprooted from the region.*" One month later, he elaborated, "*The perpetual aim of Iran is the obliteration of Israel.*"  Ayatollah Ali Khamenei has been found to be an instrumentality of Iran for purposes of liability and damages under the FSIA.  See, e.g., *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1 (D.D.C. 1998).

39.    The Islamic Revolutionary Guards Corp (IRGC) a/k/a The Pasdaran, has been designated a terrorist organization pursuant to Executive Orders 13224 and 13382 (2007). The IRGC is directly controlled by the Ayatollah Ali Khamenei and is the dominant force within the ruling establishment in Tehran today. The IRGC holds a controlling number of positions in the Iranian government and its economy.

40.    Upon information and belief, the IRGC has provided AAMB directly and indirectly with training in the use of explosives, improvised explosive devices ("IED's") firearms, sophisticated weapons such as Katyusha rockets and Strela antiaircraft missiles, assassinations, espionage, clandestine communication, ambush and kidnapping, as used in the attack described herein.

41.    The Islamic Revolutionary Guards Corp - Al Qods Forces (a/k/a "Qods," "Qudes Force," "Quds Force" or "Qods Force") has been designated a terrorist entity pursuant to Executive Order 13224, and 13382 (2007).

42.    Iran's terrorist training bases are operated by the IRGC, primarily through its Qods force. The Qods Force activities range from establishing educational systems for indoctrination and recruitment and for the civilian infrastructure supporting Iran and its radical ideology, to operating armed terrorist and guerilla cells around the world, conducting international espionage, WMD, including nuclear, and advanced missile procurement and proliferation, and acting to subvert secular, pro-Western Arab-Muslim regimes.

43.    Upon information and belief, the IRGC in its own capacity and by and through its Qods Force and its commanders General Mohammad Ali Ja'afari, former Brigadier General of the IRGC and Commander of the IRGC land forces from 1991-2005, and General Qasem Soleimani, Qods Commander since 2000 (appointed by then President Ali Akbar Hashemi Rafsanjani), both of whom have been designated by the US Treasury Department in consultation with the Department of State and Justice Department pursuant to E.O. 13382, at all times relevant to this Complaint, directed, financed, materially supported, aided and abetted and/or conspired with those who carried out the attack as described above, by providing the necessary weapons, explosives "technical" and military training, finance, as well as logistical, tactical, organizational support and safe haven to  the AAMB, who were responsible for executing the vicious attack against the Plaintiff and her family.

44.    In his official capacity as Iranian president, President Mahmud Ahmedinejad, a former commander of the IRGC and close advisor of the Ayatollah Khamenei since the 1980s, at all times relevant to this Complaint, materially supported, aided and abetted and/or conspired with those who carried out the attacks as described herein, by encouraging, financing, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks by

terrorist organizations such as the AAMB against U.S. interests, US citizens and Jewish/Israeli targets worldwide.

45.    Former Iranian President Ali Akbar Hashemi Rafsanjani wielded great political power over the Iranian regime, during the year relevant to the attack against Plaintiffs. Rafsanjani, former President, Speaker of the Iranian Parliament, Assembly of Experts and the current Chairman of The Expediency Discernment Council, also believed to be one of the creators of the IRGC, and the right-hand man to Ayatollah Khamenei, was instrumental in planning, and hosting meetings between Iran and worldwide terrorist organizations including Hezbollah, Hamas and Palestinian Islamic Jihad ("PIJ") and Fatah/AAMB to promote Iran's terrorist agenda in the Middle East. In his capacity as holder of key offices high in the Iranian regime, Rafsanjani materially supported, aided and abetted and/or conspired with those who carried out the attack as described above, by financing, encouraging, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks against U.S. citizens and interests and Israeli/Jewish targets worldwide, by terrorist organizations that included the AAMB.

46.    National Petrochemical Company ("NPC") is owned by the Iranian government and upon information and belief controlled by IRGC and an agency and instrumentality of the Iranian government.  NPC aids and abets AAMB by providing cover and camouflage for the illicit transport of weapons and explosives as well as clandestine and open sources of monies to finance international terrorism.  For example, while most smuggling operations likely are not detected, on November 3, 2009, the Israeli Navy intercepted on the high seas a ship procured by the Islamic Republic of Iran Shipping Lines, which had over 500 tons of high grade explosives and weapons falsely packaged, documented, and concealed as polyethylene pellets shipped by NPC, purportedly to a commercial entity in the middle east but actually to Hezbollah in

Lebanon, for, upon information and belief, ultimate smuggling into Gaza (for use by terrorist organizations). The shipment contained over 2000 107mm rockets, approximately 700 122mm rockets and fuses, approximately 5700 60mm mortar shells, 2300 81mm mortar shells, 780 120mm mortar shells, 3000 106 mm recoilless artillery shells, 20,000 hand grenades, and 570,000 rounds of light ammunition. Former President Rafsanjani denied reports of the weapon seizure on his families' website Ayande.

47.     The Islamic Republic of Iran Shipping Lines ("IRISL") Iran's national maritime carrier, is a global operator with a worldwide network of subsidiaries owned by Iran and upon information and belief, controlled by IRGC.  IRISL has been designated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") for nuclear and weapons proliferation activity as well as falsifying documents and using deceptive schemes to shroud their involvement in illicit and illegal commerce, which includes aiding terrorism.

48.     According Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, in written testimony before the Senate Foreign Relations Committee on June 22, 2010, *"Since January 2009, IRISL has been publicly implicated in multiple shipments of arms-related material from Iran to Syria in violation of UN Security Council Resolution 1747" [prohibiting arms shipments to Hezbollah].*

49.     In 2001, Israel intercepted over 50 tons of weapons and explosives that were illegally and clandestinely shipped from Iran to the Palestinian Authority that would have significantly improved the capabilities of the terrorist organizations, primarily of the Fatah/AAMB.

50.     Upon information and belief, at all relevant times of this Complaint, IRISL was directly and indirectly involved in illegal shipments of arms to terrorist organizations and designated state sponsors of terrorism, including Syria, Hezbollah, Fatah/AAMB, Hamas, PIJ and the PFLP-GC

14

and has provided significant and material support, and aided and abetted terrorism perpetrated by the AAMB.

51.     The Ministry of Information and Security (MOIS) a/k/a Ministry of Intelligence and Security has consistently been found by this Court to be an instrumentality of Iran for purposes of liability and damages under the FSIA.

52.     The MOIS is the intelligence service of Iran, responsible for coordinating Iran's international terrorist activities and is one of the most powerful ministries of the Iranian government. The MOIS is responsible for intelligence and espionage used to support terrorist operations, for liaison activities which support terrorist groups such as Hezbollah, AAMB, Hamas and PIJ, and in the overall planning and executing of terror attacks abroad. It is logistically supported by the Ministry of Foreign Affairs which enables MOIS and IRGC personnel to travel overseas under diplomatic cover.  In fact, MOIS personnel are either delegated as diplomats in Iranian embassies and consulate offices or as Ministry of Guidance and Propaganda representatives. The MOIS has been found to be directly involved in directing and approving operational echelons and chosen targets.  MOIS materially supported, aided and abetted and/or conspired with those who carried out the attack as described above, by financing, encouraging, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks against U.S. citizens and interests and Israeli/Jewish targets worldwide, by terrorist organizations, including the AAMB.

53.     The National Iranian Oil Company ("NIOC") a parasternal corporation owned and controlled by the Iranian government, provided material support, aided and abetted and conspired with those who carried out the attack herein, by, among other actions, funneling funds to the IRGC and the Iranian government with knowledge that Iran used those funds to support

terrorist activities and terrorist organizations including Hezbollah, the AAMB, PIJ and Hamas. Upon information and belief, NIOC is a major source of Iran's financing of its terror and of IRGC activities abroad. As such the U.S. Treasury has listed the NIOC, and its affiliates, as companies with whom U.S. citizens and companies are prohibited form transacting business. (See, Iranian Transactions Regulations, 31 C.F.R. Part 560).

54.     The Iran National Airlines Corporation ("Iran Air") is an Iranian corporation wholly owned and controlled by the Iranian government. *Marschalk Co. v. Iran Nat'l Airlines Corp.,* 518 F.Supp. 69, 88 (S.D.N.Y. 1981); *Comet Enters. v. Air-A-Plane Corp.,* 128 F.3d 855, 859 (4th Cir. VA 1997).

55.     Upon information and belief, at all times relevant to this Complaint, Iran Air materially supported and/or aided and abetted and conspired with those who carried out the attack herein by providing transport and funneling funds to the Iranian government with knowledge that the government used those funds to support its terrorist activities. Iran Air further assisted Iran's efforts to export terrorism by transporting weapons, explosives, rockets, funds and individual terrorists for the purpose of committing terrorist acts in foreign countries including carrying out terror attacks in Israel. Upon information and belief, Iran Air's passenger and cargo planes have been used to transfer weapons, including rockets, through Syrian airports, for use by terrorist organizations such as the AAMB. Additionally, the IRGC and the MOIS "unofficially" have used Iran Air to travel abroad (i.e. Syria) and collect intelligence, plan attacks and support terrorist groups including the AAMB, Hezbollah, PIJ and Hamas.

56.     Bank Melli, Bank Saderat and Bank Sepah are owned and controlled by the Iranian government and are agents and instrumentalities of Iran. Upon information and belief, at all times relevant to this Complaint, the above-mentioned banking institutions have materially

supported, aided and abetted, laundered monies, provided extensive banking services, including clandestine international money transfers, and conspired with those who carried out the attack herein by contributing to and supporting the Iranian regime and Iran's sponsored terrorist organizations including the AAMB, PIJ, Hezbollah and Hamas.  Further, upon information and belief these banking institutions have knowingly kept accounts for the Iranian government, and the IRGC and its commanders, with the knowledge that Iran uses the accounts to support terrorist groups such as PIJ, Hamas and others.  *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (1995).

57.    Bank Saderat has been designated under Executive Order 13224 for its significant role in facilitating and supporting the activities of terrorist organizations, including Hezbollah, HAMAS, the PFLP-GC, and PIJ.

58.    On June 22, 2010, Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, in written testimony before the Senate Foreign Relations Committee, testified that "...*there is a vast body of public information demonstrating that many of Iran's banks are deeply involved in facilitating its proliferation-sensitive activities and other forms of illicit conduct.   Over the last several years, we have designated fifteen Iranian banks under Executive Order (E.O.) 13382 for facilitating Iran's nuclear proliferation activities, and one bank under E.O. 13224 for providing support to international terrorism...Banks like Bank Melli have also provided financial services to the IRGC, and Bank Saderat has facilitated the transfer of millions of dollars to terrorist groups.   In the course of undertaking these transactions, Bank Melli employed deceptive banking practices, like requesting that its name be removed from financial transactions to obscure its involvement from the international banking system.*"

59.    Upon information and belief, Bank Melli provides financial services for illicit Iranian front companies, such as the Alavi Foundation Inc. of New York.  Bank Melli has been found by

OFAC to provide services to designated terrorist organizations IRGC and Qods. Bank Melli and its branches and subsidiaries have been designated by the OFAC as proliferators of weapons of mass destruction under Executive Order 13382 (2005) as well as by the European Union and Australia.

60.    Iran's state-owned Bank Sepah is the fifth-largest, Iranian state-owned bank. Bank Sepah has been designated under E.O. 13382 as "*a terrorist financier*" and blacklisted by United Nations Security Council Resolution 1747.

61.    Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and PIJ. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence. Hezbollah has used Bank Saderat to send money to other terrorist organizations, which directly or indirectly provide funding to the AAMB.

## AGENCIES AND INSTRUMENTALITIES OF SYRIA

62.    At all times relevant to this Complaint, President Bashar al Assad has been the President of Syria and the Commander-in-Chief of the Syrian Armed Forces (since June 10, 2000). Upon information and belief, President Bashar al Assad has directed, incited, materially supported, aided and abetted and conspired with those who carried out the attacks herein by providing material support and resources including, funding, safe-haven, training facilities, logistics, security, intelligence, location and assistance in transferring weapons to terrorist organizations directly and indirectly. Under the tyrannical rule of President Bashar Syria's support for terrorist organizations has increased. As an agent of Syria, President Bashar al Assad, maintains an

interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

63.    Defendant The Arab Republic of Syria ("Syria"), through its employees, officials, agents, ministries and instrumentalities, has financed, supported, directed, encouraged, incited, contributed, aided and abetted and conspired with the terrorists responsible for the injuries of the Plaintiff.  These individuals and entities, owned and controlled by the Syrian regime, qualify as agents and/or instrumentalities and/or alter egos of Syria within the meaning of §1603(a) of the FSIA.[6]  As agents and instrumentalities of Syria and its senior officers, these entities and individuals maintain a presence and/or interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

64.    Upon information and belief, in or about May 2001, Defendant Bashar Al Assad caused to be established a "charity" called The Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan (the "Committee").  Ahmad Abdul Karim, retired colonel of the Syrian army, was appointed its Chairman and tasked with collecting donations to support the Al Aqsa Intifada, and launder such funds in order to transfer them to terrorists and their families in the West Bank and Gaza regions. Upon information and belief, at all times relevant to this Complaint, the Committee materially supported, aided and abetted and conspired with those who carried out the attack herein by providing necessary financing and funding to the AAMB directly and/or indirectly.  Since its establishment, the Committee has collected and laundered approximately $20 million, which has been used to aid, support and finance terrorists such as those responsible for the Plaintiff's injuries and suffering.

---

[6] The definition of "foreign state" in the FSIA includes agencies and instrumentalities of a foreign state. See 28 U.S.C. § 1603(a)(b). See also *Foremost-McKeeson v. The Islamic Republic of Iran*, 905 F.2d 438, 446 (DCCir.1990)

65.    The Real Estate Bank of Syria ("REB") is wholly-owned and controlled by the Syrian government and is thus an agent and instrumentality of Syria.  Upon information and belief, at all times relevant to this Complaint, the REB maintained and managed bank accounts of the Committee, and knowingly financed and supported terrorist organizations directly and indirectly including the AAMB.

66.    The Commercial Bank of Syria ("CBS") is wholly owned and controlled by the Syrian government and thus is an agent and instrumentality of Syria.  At all times relevant to this Complaint, CBS maintained and managed bank accounts of the Committee, and knowingly financed and supported terrorist organizations including the  AAMB. CBS is well known for its support of terrorism and involvement in money laundering and was designated by the U.S. Treasury Department as a financial institution involved in money laundering pursuant to §311 of the USA Patriot Act.

## NON PARTY ACTORS

## AL-AQSA MARTYRS BRIGADE

67.    The Al-Aqsa Martyrs Brigade a/k/a/ Al-Aqsa Martyrs Battalion ("AAMB") is a terrorist organization based in the West Bank and Gaza Strip, formed and controlled by al Fatah, a former terrorist organization established by Yasser Arafat, which purportedly renounced terrorism, and today is a political party within the Palestinian National Authority.  The AAMB is the armed wing of Fatah.  In an interview for USA Today, conducted on March 14, 2002, Masalma Thabet, leader of the AAMB in Tulkarm, stated that *"our group is an internal part of Fatah."* Thabet further stated that *"the truth is, we are Fatah itself, but we don't operate under the name of Fatah. We are the armed wing of the organization. We receive our instructions from Fatah. Our commander is Yasser Arafat himself."*[7]

---

[7] IDF captured documents during Operation Defensive Shield, prove unequivocally that the Fatah organization and the Al Aqsa Martyrs Brigades are one and the same and they cannot be separated. The documents clearly indicate

68.     Since its establishment, the AAMB has committed numerous attacks in Israel, the Gaza Strip and the West Bank in which hundreds of civilians were killed and wounded, including citizens and nationals of the United States.

69.     The AAMB has openly adhered to a mission to destroy, topple and eradicate the State of Israel and Jews living in Israel and replace it with an Islamic and/or Arab Palestinian State and uses violent means to achieve its goal.

70.     On September 23, 2001 the US Department of State designated the AAMB as a foreign terrorist organization and on October 31, 2001 as a Specially Designated Terrorist Entity. Subsequently, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 (of September 23, 2001), the Deputy Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determined that AAMB had committed, or posed a serious risk of committing acts of violence that had the purpose or effect of disrupting the Middle East Peace Process and designated AAMB as a Specially Designated Global Terrorist ("SDGT").

71.     The Al Aqsa Martyrs Brigades is organized into local cells, which have conducted shooting and other attacks and suicide bombings against civilians in Israel and the West Bank.

72.     Since September 2000 AAMB has conducted and taken responsibility for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred others.

---

that not only are the Al Aqsa Martyrs Brigades a pseudonym for terrorist attacks carried out by Fatah, but they are also a terrorist apparatus, which up until IDF operation Defensive Shield was in the process of institutionalization and intensification of its suicide and murderous attacks. The captured documents demonstrate that Arafat and other senior Fatah officials (Marwan Barghouti is of note) are the leaders of the Al Aqsa Martyrs Brigades and they finance its terror activities. According to one of the documents, Arafat is well aware of the negative implications of the terrorist attacks carried out by the Al Aqsa Martyrs Brigades at the time of General Zinni's stay in Israel, and the inclusion of the Al Aqsa Martyrs Brigades in the US State Department's list of terror organizations. Therefore, he tried to deny that Fatah and the Al Aqsa Martyrs Brigades are identical, and distanced himself from them. (See

73.     While not the most publicized of Palestinian terror organizations, the AAMB has organized some of the most gruesome terrorist attacks in Israel, especially during the escalation of violence commencing in 2001, when the AAMB increased the level of its cooperation with other terrorist organizations, including Hamas and PIJ. A number of bombings and shootings were perpetrated by the AAMB, individually or in partnership with other terrorist groups such as Hamas and PIJ.

74.     AAMB has acknowledged responsibility for terrorist attacks, including shooting attacks, ambushes and suicide bombings, which employed new techniques, such as deploying the first female suicide bomber.

75.     The AAMB has also recruited 15-year-old boys to carry out suicide bombing attacks. AAMB, like Hamas and PIJ, promised suicide bombers that payments would be made to their families after the attacks were conducted, in part in reliance upon the funds provided by Iran and Syria and committees set up specifically for this purpose. Such promises have fueled and incentivized youth to continue to commit such suicide attacks.

76.     During "Operation Defensive Shield" carried out by the Israeli Defense Force, it was discovered that Munir Hussein Khalil Al-Maqdah ("Maqdah"), leader of the Fatah faction had transferred large sums of money to support Fatah/Tanzim/AAMB terrorists in various West Bank areas, which he received from Iran and Syria. According to a mainstream Fatah official, Maqdah *"has very good ties with Syria and Iran. These countries pay him millions of dollars,"* used to fund terror attacks by the Fatah/AAMB and Tanzim.

77.     A Palestinian Authority General Intelligence document, seized by the IDF in Jenin, demonstrates further that Fatah/AAMB and the Palestinian Authority ("PA") security apparatuses

---

Jewish Virtual Library; The involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism Against Israel, Corruption and Crime)

in Jenin continually cooperate with the other terrorist organizations such as the PIJ by supplying them with weapons, executing joint large scale terror attacks in Israel (i.e. Afula attack on 11/27/2001) and providing early warnings with regards to the Palestinian Authority's intentions to act against them.

78.    According to claims by Hamas, PIJ and AAMB, a number of terrorist attacks and Qassam rocket launches into Israel have been carried out jointly by two or more organizations acting together.

### IRAN AND ITS TIES TO TERRORISM (AGAINST THE US/WEST/ ISRAEL)

79.    The Islamic Republic of Iran ("Iran") is a foreign state which at all times alleged hereinafter was designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405 (j)), § 620A of the Foreign Assistance Act, 22 U.S.C. § 2371; and § 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d).

80.    Support for terrorism is an official state policy of the Iranian regime.  Since the Islamic Revolution in 1979, Iran has become notorious for its radical foreign policies, including engaging in terrorism.  Iran is the foremost nation in promoting, endorsing and employing terror to achieve its objectives. Iran's involvement in terrorism, which it refers to as *Exporting the Revolution*," has been instrumental in providing weapons and training to other terrorist organizations and surrogates in various countries, in order to further their causes.

81.    Iran has a nine-figure line item in its budget to support terrorism, sending hundreds of millions of dollars to various groups each year. U.S. officials have described the Iranian regime as the world's "central banker of terrorism."  Iranian security and terror apparatuses have perpetrated hundreds of terror attacks throughout the world, largely aimed at U.S. and Israeli citizens and targets.[10]

82.    As a pattern of its worldwide terror, Iran has perpetrated some devastating attacks against US and Western targets.  Iran sponsors and hosts numerous conferences involving terrorist organizations.

83.    According to testimony given by Daniel Glazer, Treasury Deputy Assistant Secretary for Terrorist Financing and Financial Crimes  before the House of Representatives Committee on Foreign Affairs on April 17, 2008:

> The threat we face from Iran is not limited to its pursuit of nuclear capability.  Another dynamic of Iran's threat is its provision of financial and material support to terrorist groups.  Iran has long been a state sponsor of terrorism and continues to support an unparalleled range of terrorist activities.  For example, Iran arms, funds and advises Hizballah, an organization that has killed more Americans than any other terrorist network, except for al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guards Corp.  In addition, Iran provides extensive support to Palestinian terrorist organizations, including Palestinian Islamic Jihad and Hamas.  In the case of PIJ, Iran's financial support has been contingent upon the group's carrying out attacks against Israel.  And we are all familiar with Iran's funding, training and equipping select Shi'a extremist groups in Iraq, further destabilizing that country, and resulting in the deaths of Americans, Iraqis and others. Iran's Qods Force also provides weapons and financial support to the Taliban to support anti-US and anti-Coalition activity in Afghanistan.  Iran utilizes the international financial system as a vehicle to fund these terrorist organizations…the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism.

84.    Iran's terror activity is not an act of one man alone but requires the approval of the decision-makers in the Iranian government - the Supreme National Security Council, which includes the Supreme Leader Ali Khamenei as well the IRGC and the Iranian Ministry of Information and Security ("MOIS") which has been found to be directly involved in directing and approving operational echelons and chosen targets.

85.    More than a military branch of Iran, the IRGC is the dominant force within the ruling establishment in Tehran today having evolved to permeate all aspects of the state, including political, economic and cultural aspects of Iran.  The IRGC, which was formally created by decree in December 4, 1979, by the Supreme Leader Ayatollah Ruhollah Khomeini, has been

linked to international and local terror activity since 1982.[8] The U.S. State Department has noted that the IRGC provides support for several terrorist groups in Israel such as Hezbollah, PIJ and others.

86.    The IRGC has been involved in terror attacks worldwide on behalf of Iran.

87.    The IRGC is also a business conglomerate that controls over 500 companies spanning a wide range of industries, including nuclear power, banking, insurance, retail, shipping, and airlines. By most estimates the IRGC is Iran's third largest corporation.

88.    Economically, the annual turnover of IRGC business is estimated at $12 billion with total net profits of $1.9 billion. Almost all of the public sector companies marked for privatization are expected to end up in the hands of the IRGC and its individual commanders.[9] Quoting former US Treasury Secretary Henry Paulson, "It is increasingly likely that if you are doing business with Iran you are doing business with the IRGC."

89.    The U.S. Treasury has designated numerous Iranian companies under E.O. 13382 based on the fact that these entities are owned or controlled by the IRGC and its leaders. Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, testified, in written testimony before the Senate Foreign Relations Committee on June 22, 2010, *"We also designated the IRGC's Qods force, the branch of the Revolutionary Guards that has provided material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and others. Last week we supplemented these actions by designating additional branches of the IRGC...In addition, we designated Mohammad Ali Jafari, the Commander-in-Chief of the IRGC...With these actions, we have now designated 26 entities and individuals connected to the IRGC for sanctions...We intend to continue to focus on the IRGC as an important part of our strategy to*

---

[8] In addition to Quds, the IRGC is made up of four additional branches: Ground Forces, Air Force, Navy and Basij militia.

*hold Iran accountable for its actions because of the central role that the organization plays in Iran's most reprehensible and illicit conduct. In addition to playing a key part in Iran's missile and nuclear programs and providing support for terrorism..."*

90.     These designations pursuant to E.O 13382 affirm that the IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors which it uses for illicit purposes, including funding terrorism. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. IRGC officers have been appointed as governors of twenty of Iran's thirty provinces.

91.     The IRGC finances Hezbollah branches in 20 countries and provides money, arms and training for radical groups including Fatah/AAMB, PIJ and Hamas directly or indirectly through IRGC, Quds Force and/or Hezbollah. IRGC is a significant financier and supporter of the PIJ, Hamas and Fatah/AAMB/Tanzim (as well as of other terrorist groups targeting American citizens in Iraq, Yemen, Afghanistan and Pakistan).

92.     Iran's terrorist training bases are operated by the IRGC, primarily through its Qods force. Qods is one of five branches of the IRGC, the strongest military-security body in Iran and the regime's main support. Qods activities range from establishing educational systems for indoctrination and civilian infrastructures supporting Iran and its radical ideology to operating armed terrorist and guerilla cells and acting to subvert secular, pro-Western Arab-Muslim regimes.

93.     Qods has provided training in the use of explosives, improvised explosive devices ("IED's") firearms, sophisticated weapons such as Katyusha rockets and Strela antiaircraft

---

[9] The Middle East Quarterly: The Revolutionary Guards' Role in Iranian Politics; Ali Alfoneh, Fall 2008, pp. 3-14

missiles, assassinations, espionage, clandestine communication, ambush and kidnapping to terrorist organizations, including Hezbollah, PIJ and Hamas who act in concert with the AAMB. Qods is also responsible for waging indirect war against the U.S. and allied forces in Iraq and Afghanistan.   Currently, assistance and training to these terrorist organizations is conducted through Qods, which operates abroad, including in camps in Lebanon and Sudan.   The IRGC in Lebanon actively recruits Palestinians to fight Israel.

94.     Iran has provided and continues to provide substantial, systematic, financial and military support to Palestinian terrorist organizations in the form of money, weapons, explosives, training, sanctuary, documentation, intelligence, and other types of assistance.   Specifically, this support is provided to designated terrorist organizations such as Hezbollah, PIJ, Fatah/AAMB and Hamas. The aid provided by the Iranian regime to these organizations comes simultaneously with this regime's repeated and declared agenda to "wipe the State of Israel off the map."

95.     Defendant Iranian Supreme Leader Ayatollah Ali Khamenei, along with others in the Iranian leadership named in this Complaint, continuously reiterate in Islamic and international forums the legitimacy of Palestinian terror and provide venues for conferences that support their continuation.   On October 31, 1991, Iran hosted the International Conference for the Support of Muslim Palestinian People's Revolution, which was attended by both Islamic and secular Palestinian groups. The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities. From 2000 to 2006, Iran continued hosting annual meetings of the Palestinian terrorist organizations under the slogan "*The International Conference for the Support of the Palestinian Intifada.*"

96.    Supreme "religious" leader, Ayatollah Khamenei and President Ahmadinejad have publicly praised Palestinian terrorist operations, and Iran provided Palestinian terrorist groups – among them, Hezbollah and Fatah/AAMB with extensive funding, training and weapons.

97.    Defendant Ayatollah Khamenei publicly proclaimed: "...*we regard Palestine as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people...The Palestinian people must continue the blessed Jihad* [holy war] *and its standing against the enemies of Islam... **The Hamas, Islamic Jihad and Fatah** forces must continue the struggle in a united way... But, indeed, the only solution [to the crisis in the region] is the elimination of the root of this crisis, which is the Zionist regime imposed on the region.*" (Khabar TV, Iran, 20 October 2000).

## IRAN AND ITS TIES TO AAMB

98.    In July 2004 Hezbollah's secretary general Hassan Nasrallah, publicly stated that Hezbollah was active in providing operational support for the Palestinian operatives,[10] after which, Fatah/AAMB leaders publicly admitted that they had received support from Iran and Hezbollah, including financial support.

99.    Other high-ranking Fatah/AAMB operatives have also made public the support they receive from Iran and Hezbollah. Jibril Rajoub, the previous director of the PA Preventative Security has noted that Iranian financial support has been transferred via Hezbollah to escalate violence. Abu Mujahid, a senior operative of AAMB in Nablus, said: *"We do not hide the fact that some active operatives of our organization are financed and encouraged by interested parties, from senior Palestinians who finance operations to inflame the situation to operatives who are financed by Hezbollah and Iran. Both work to promote their own personal interests and those of their supporters, interests contrary to the good of the Palestinian people. But the*

*Brigades (AAMB), the real activists, are part of Fatah and are not an armed band working for one group or another."*[11]

100.    At least two suicide attacks committed by Fatah/AAMB members from Nablus were financed by Iran and Hezbollah: the Tel Aviv Bus Station [January 5th 2003, 22 dead] and the Kfar Saba railway station [April 24th 2003, 1 dead][12]

101.    Press reports have also claimed that Iran has traditionally funded Palestinian dissident groups in the Lebanese refugee camps, including ex-PLO Colonel and Fatah leader Munir Maqdah Al-Maqdah ("Maqda"), through the *Institute of the Palestinian Martyrs* (a/k/a the Shahid, Martyrs Fund) which helps the families of war casualties, including Palestinians and the Hezbollah. [13] During the second Palestinian uprising, Maqda began to finance, partially, the terror cells of Nasser Aweis, the commander of AAMB in the West Bank. Nasser Aweis was involved in a series of murderous terrorist attacks in Israel, in which dozens of Israelis were killed and wounded, including the terrorist attack in the banquet hall in Hadera (17 January 2002 during a bar mitzvah celebration), a shooting attack in Jerusalem and a shooting attack in Netanya (9 March 2002). After his arrest, Nasser Aweis revealed that Maqdah transferred large sums of money to support Fatah/Tanzim/AAMB terrorists in various West Bank areas with monies he received from Iran.

102.    Jamal Mustafa Huweil, arrested during operation Defensive Shield was the treasurer of the AAMB - Jenin area. Huweil described the ties between AAMB-Jenin and Maqdah, including the receipt of financial aid from Maqdah, approximately $5000, transferred every month or two

---

[10] Al Manar TV, July 19th 2004
[11] Ynet News interview, August 3rd 2004
[12] See Malam brief: http://www.terrorism-info.org.il/malam_multimedia/html/final/eng/bu/iran/chapt_c.htm
[13] The bonyad-e Shahid a/k/a the Martyr's Foundation is a front organization based in Lebanon. Since 1995 it has allegedly raised  substantial funding to terrorist organization such as Hezbollah, likely in excess of $100 million annually

to the account of Nasser Aweis from Nablus.  Jamal Huweil stated that he was in direct contact with Maqdah and would report to him about terrorist attacks carried out by the AAMB in the Jenin area. In this context, he reported about the suicide attack in Afula (27 November 2001) carried out jointly with PIJ, an attempted attack in Haifa and other attacks carried out in Jerusalem and Hadera.

103.    The arrest of three brothers, Fadi Nazmi Hamdi Abdu a key Fatah/Tanzim/AAMB operative and Hamdi and Shadi Abdu in 2003, shed further light on the extensive financial assistance extended by the IRGC and Hezbollah to support Fatah/AAMB terrorist infrastructures across the Northern West Bank.  Funds that were transferred through Jordan by these three brothers totaling approximately NIS 1,000,000 (approximately US $300,000) were used to finance terrorist activities. A portion of these funds served as a direct source of funding for a terrorist attack at the Kfar Saba railway station. (April 2003).

104.    In his interrogation, Fadi Nazmi Hamdi also described his contacts with a Fatah/AAMB activist named Fouad Balbisi, from Amman, Jordan. Balbisi acted as coordinator between Fatah and Iran, funneling funds via Hezbollah bank accounts in Beirut.

105.    Fuad Shubaki, a senior consultant and money-man for Yasser Arafat and head finance for the Palestinian Authority General Security Service stated during interrogation after his arrest by the IDF, that the IRGC and Hezbollah helped finance and guided the smuggling attempt by the infamous Karine A (ship seized by Israel loaded with weapons).

106.    According to media accounts, Iranian experts from the IRGC in Lebanon have instructed Palestinians from the Fatah/AAMB and Hamas in the use of individual SA-7 (Strela) shoulder launched ground-to-air missiles. For example, a course was conducted at the Janta Base in the Bekaa valley in Lebanon.  Twenty Palestinians from the Fatah/AAMB and Hamas organizations

jointly took part, after having participated the previous year in a basic military course given by the IRGC in Lebanon.   Upon completion of the course, the graduates underwent a special training course in Iran, near the city of Qom, and from there returned to the Palestinian territories. Chief operatives of the IRGC were closely involved in this matter, including the coordinating member of the IRGC, Ali Reza Hamiz, and the liaison officer, Munir Maqdah, leader of Fatah, operating in the Ayn Al Hilwah refugee camp near Sidon.

107.    Defendants Ayatollah Ali Khamenei, president Mahmud Ahmedinejad and former president Ali Akbar Hashemi Rafsanjani have been and continue to be, directly involved in terror attacks, and are the lead forces within the Iranian government/regime responsible for providing the rhetoric, incitement, encouragement, financing, assistance and direct approval of terrorist attacks directed at civilians in Israel and US interests and civilians in the Middle East

108.    Iran's press and media systematically encourage the continuation of the Intifada and glorify violent action and suicide attacks against citizens, residents and visitors in Israel. Through public statements issued by government representatives, spokesman and officers, religious leaders, using mass communications under their control, they continuously advocate slogans such as "*Death to America – Death to Israel*," encourage, solicit, facilitate and incite the use of violence and terrorism against civilians in Israel, Gaza and the West Bank as well as Americans (civilians and soldiers) in Iraq and Afghanistan.[14] At weekly prayer meetings carried on Iranian television and reported in the Iranian press, the clerics encourage and commend terrorist action as important to its worldwide cause.   A supreme example is Iran's annual celebration of World Jerusalem Day, a national holiday dedicated to the vision of annihilating the state of Israel. The key note speech by Mahmud Ahmedinejad is always anti-Semitic, anti-Israel

and anti-America. The following is a translated excerpt of President Ahmadinejad's September 2009 speech at this national holiday: *"If war breaks out in Iraq we believe Zionism incited it, and the same is true for war in Afghanistan...If there is oppression in Sudan it is also the work of Zionism... The Zionist Regime is like a rotting tree in every respect- its roots, trunk and leaves are all regimes, cruelty and corruption in they don't let go..."* Iran President: Israel "Will Soon be Wiped Out" In Iran, president Mahmoud Ahmadinejad has renewed his previous calls for Israel's elimination.

109.    In a memo sent to Arafat, on 31 October 2001, Jibril Rajub, then the director of the PA Preventive Security, mentioned a meeting had taken place in Damascus between leaders of terrorist organizations including PIJ, PFLP[15] and Hezbollah noting that Iranian financial support had been transferred via Hezbollah in order to escalate violence.

110.    Official reports of the Israeli Foreign Ministry note that tens of millions of dollars have been transferred annually by Iran to the Palestinian terrorist organizations, including AAMB (largely through Hezbollah), which have ultimately enhanced the terrorist's capabilities and encouraged them to carry out more attacks.

111.    Plaintiff alleges that the financial support the AAMB receives directly or indirectly from Iran, comes from monies and other support Iran receives from its highly lucrative government owned and controlled businesses such as the National Iranian Oil Company, the National Petrochemical Company, Iran Air, IRISIL, Bank Melli, Bank Saderat and Bank Sepah.

112.    Not coincidentally, involvement by the IRGC has significantly increased in the Iranian oil, gas and energy sectors.  These Iranian owned and operated oil and gas companies are so

---

[14]An example of one of many of Ahmadinejad's anti-Israel quotes in December 2006: "I want to tell them (Western countries) just as the Soviet Union was wiped out and today does not exist, so will the Zionist regime soon be wiped out."

involved in numerous lucrative ventures with the IRGC that, since 2005, the IRGC controls de facto the biggest oil deals.

113.    These high profile Iranian owned and operated petroleum companies are clearly agents and instrumentalities of Iran.  They are controlled by the IRGC and monies obtained by these companies are utilized both directly and indirectly to fund the AAMB, and other terrorist organizations with which the AAMB jointly operates (namely Hezbollah, PIJ and Hamas).

114.    The NIOC (National Iranian Oil Company) and its affiliates have been listed, pursuant to the Iranian Transactions Regulations-31 C.F.R. Part 560, as companies with which US companies are prohibited from transacting business.

115.    Iran also utilizes its banking institutions to finance and facilitate assistance to terrorist organizations such as Hezbollah, AAMB, Hamas and PIJ.   These include the Bank Melli of Iran (a/k/a the National Bank of Iran), Bank Saderat of Iran and Bank Sepah, all of which are owned and directly controlled by Ayatollah Khamenei, Iranian President Mahmoud Ahmadinejad, and/or the IRGC , all of which have been designated by the US as sanctioned companies with whom US companies are prohibited from transacting business.  See, *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (1995).

116.    A fact sheet released by the U.S. Treasury Department also asserts that, between 2002 and 2006, Bank Melli sent at least $100 million to terrorist groups, via Al Qods Force including Hamas and PIJ who cooperated in joint attacks with the AAMB.

## SYRIA AND ITS TIES TO TERRORISM AND TO THE AAMB

117.    Syria has been designated by the U.S. State Department as a foreign state sponsor of terrorism, pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)), signed December 29, 1979.

118.    Throughout the years, Syria has been involved in terror activities against Israeli/Jewish targets throughout the world, as well as Western targets, specifically Americans because of its support of Israel. While Syria has denied connections to terror attacks against the US, the Syrian government's involvement in terror activities has been proven in numerous terror events carried out in the international arena as early as the 1980s.

119.    Continuously since the late 1960's, the Syrian regime has maintained a strategy of waging a proxy war against Israel through support of the Fatah organization and other Palestinian terrorist groups.

120.    Syria and Lebanon are said to host the greatest concentration of terrorist training camps in areas directly or indirectly controlled by Syria.   Iran falls closely behind Syria and Lebanon in this regard.

121.    Syria has hosted numerous meetings in connection with discussions of escalating terror activities, largely involving Iran. In 1982 an Iranian military delegation arrived in Syria in order to discuss the ways by which Iran could help Lebanon.  The commander of the IRGC, Mohsen Rezaee, who attended the meetings said: "The delegation came to Syria in order to study the problem (in Lebanon) and to fulfill the true principals of Jihad for which our people had waited for many years and for teaching the Zionists a lesson."  As a means of implementing this aspiration, several groups of Iranian volunteers arrived during June 1982 to Damascus.

122.    The Bashar al Assad regime has spoken out publicly in defense of "*martyrdom operations*" and has even influenced state-appointed religious leaders to validate the attacks.  In December 2001, one of the most prominent Islamic leaders in Syria, Mahmoud Akkam of Aleppo, issued a *fatwa* saying that the killing of Israeli civilians was permissible and "even a duty" under Islamic law.

123. President Bashar Assad and his regime have continued to openly praise the Palestinian terrorist organizations, For example: Damascus Radio - Date: 9 May 2002 "*The magnificent and unique suicide operation which some of the Palestinian people sons carried out in Rishon Le-Ziyyon, is a practical declaration to the entire world about the way to liberate Arab Palestinian land from Israeli colonialism.*" Al Majd, Jordan, on 19 March 2001 "*We seek to support the Intifada which we consider to be a brave struggle phenomenon which must not be abandoned nor should its support be delayed. The Oslo agreement is dead... just as we stood by the Lebanese struggle we will always stand by the Palestinian struggle...*" Al Ahram, Egypt, 16 November 2001, Former Vice President Khaddam: "*We never succeeded to surpass Israel with regard to armament and international aid, and the importance of the resistance is in its use of weapons which Israel does not have - the weapon of the will to resist and the martyr deaths. It has been proven that Israel cannot contend with this weapon.*" Al Ra'e Al Aam, Kuwait 25 December 2001: (Former) Foreign Minister Al Shara current Vice President: "*It is possible to balance [implicitly, Israel's military and technological capabilities]by focusing on the enemy's weaknesses... if a person wants to blow himself up, no force can prevent him from doing so ... Syria has given everything to the Intifada.*"

124.    Syria has provided continuous training, weapons, explosives, funding, safe haven and logistical support to terrorist groups including Fatah/AAMB.  Official State Damascus Radio reported on January 1, 2002, that "Syria has turned its land into a training camp, a safe haven and an arms depot for the Palestinian revolutionaries."

125.    Numerous deadly terrorist attacks committed by AAMB in Israel, the West Bank and the Gaza Strip were orchestrated in Syria.  Hundreds of civilians, including U.S. citizens, were killed and wounded in these attacks.

126.    Weapons provided to Hezbollah by Iran regularly pass through Syria with the Syrian government's knowledge and acquiescence.  These are the same weapons that were used by the AAMB against Israeli citizens.

127.    Syrian officials have themselves urged PIJ, Hamas and other terrorist groups who work in conjunction with PIJ and Hamas, namely the AAMB to increase attacks.

128.    According to a mainstream Fatah official, Fatah leader Munir Maqdah Al-Maqdah "*has very good ties with Syria and Iran. These countries pay him millions of dollars. He is using the money to undermine the local Fatah leadership and establish his own bases of power here.*"

129.    In May 2001, approximately seven months after the beginning of the Second Intifada, the Syrian government initiated the establishment of the Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan (the "Syrian Intifada Committee"). President Bashar al Assad personally authorized the formation of this committee and appointed as its Chairman

130.    The Syrian Intifada Committee's objective was to collect donations for the support of the Intifada. Since its establishment the Committee has collected at least $20 million through its branches and sub-committees located throughout the Syrian provinces.   Approximately $14 million of which was collected within the first year of the Committee's activity. [16]

131.    The Palestinian press has also covered the Committee's activity. *Al Hayat* reported, on October 6, 2001, that The Syrian Intifada Committee had announced its plan to transfer 170 million Syrian Pounds (U.S. $3.4 million) as the first round of payments to families of martyrs ("shohada") and prisoners and to other beneficiaries in the Palestinian territories.

132.    According to a report taken from *Tishreen,* another Syrian daily newspaper, at the opening-event of a subcommittee of the Syrian Intifada Committee in Latakia, Syria, the

participants, including leaders of the ruling Ba'ath party and the managers of the Syrian Intifada Committee, spoke in favor of martyrdom, suicide attacks and jihad against Israel.

133.    In order to collect the donations, the Syrian Intifada Committee opened several bank accounts.  A unified account was opened at the Real Estate Bank of Syria ("REB") and many accounts were opened at the Commercial Bank of Syria ("CBS").  CBS is a bank that is well known for its support of terrorism and involvement in money laundering.  On May 11, 2004, the U.S. Treasury designated CBS, pursuant to Section 311 of the USA Patriot Act, as a financial institution of primary money laundering concern.

134.    On March 9, 2006, after years of investigation, the U.S. Treasury finalized its designation of CBS.  A communiqué issued by Stuart Levey, the Treasury Under Secretary for Terrorism and Financial Intelligence, said that the CBS had been used by terrorists to move money and "*as a state-owned entity with inadequate money laundering and terrorist financing controls, the Commercial Bank of Syria poses a significant risk of being used to further the Syrian Government's continuing support international terrorist groups.*"  Hezbollah, PIJ, the PFLP and Hamas were listed as customers or account holders of CBS.

135.    The material support by the Bashar government to terrorist organizations such as Hezbollah, Fatah/AAMB, PIJ over the years include support from the Syrian army in allowing training to be conducted on its army bases as well as  additional support from the Ministry of Defense, and the Syrian Intelligence in  transferring of weapons, money and operatives in and out of Lebanon and the Palestinian territories without detection by providing the use of the Syrian borders for safe transit. Weapons provided by Iran to Hezbollah regularly pass through Syria with the knowledge, encouragement and aid of the Syrian Military Intelligence, Syrian Armed Forces and the Ministry of Defense, who although responsible for protecting the borders

---

[16]  The Syrian Intifada Committee remained active at least until 2009

and passport control continuously allowed weapons to reach their destination. These same weapons were used against Israeli and American citizens and visitors to Israel almost every day during the Intifada.

136.    Fatah/AAMB, along with senior intelligence apparatuses of the PA in the Jenin area, cooperates with PIJ and Hamas in order to carry out terror attacks inside Israel (for example, the Afula suicide terror attack, November 27 2001). The leadership in Damascus has given its approval to the Palestinian Jihad to reach an agreement with Fatah/AAMB elements for the purpose of carrying out joint attacks; these attacks have been planned in Syria and carried out against Israel.

137.    Ali Suleiman al-Sa'adi (A.K.A "Safuri") a senior PIJ activist, who was involved in numerous terrorist attacks in Israel admitted in his  interrogation, that from November - December 2001, he resolved to carry out a joint terrorist attack with the Fatah\AAMB.  As a senior PIJ activist, he received the approval of the PIJ leadership in Syria to reach an agreement with Fatah/AAMB on the perpetration of joint terrorist attacks.

138.    Large sums of money transferred from Syria to PIJ terrorist activists in Jenin have enabled PIJ activists to finance attacks carried out by members of the Fatah/AAMB.  The PIJ activists also helped the families of dead Fatah activists, bribed PA security members and encouraged the Fatah/AAMB to carry out joint terrorist attacks in Israel.

139.    Plaintiffs were injured by the outrageous acts of terrorism planned and perpetrated by the AAMB as indicated above.

140.    The individually named Defendants performed acts within the scope of their agencies and within the meaning of 28 U.S.C. §1605, which caused and contributed to the injuries of the U.S. citizens and U.S. nationals named in this Complaint.[17]

141.    Defendants, directly and indirectly through their agents and instrumentalities aided and abetted and conspired with the AAMB and its partners in crime, Hezbollah, PIJ and Hamas by providing such terrorist entities with the financial support, training, weapons, safe haven, incitement which were instrumental in achieving the physical and mental anguish committed against Plaintiff and her family during the horrific period known as the Second Intifada (from 2001 through 2006).

142.    The Defendants, directly and indirectly, through their agents and instrumentalities, provided material support via financing, training, weapons, safe haven, encouragement, incitement to the AAMB (and affiliated terrorist organizations such as Hezbollah) that operated jointly directing terror attacks against Israeli civilians.  The Defendants knew or should have known that this support would be used to fund and incite jihad and terrorism against Jews, Israelis, Americans and others in Israel.

143.    By providing myriad avenues along which to direct, support, incite and fund terrorist activities, The Islamic Republic of Iran and The Syrian Arab Republic revealed their relationships with the AAMB and its partner terrorist organizations.  Each and every one of the Defendants, and their respective agents, collaborated, designed, directed, incited, financed,

---

[17] 31 CFR §560.304
 §560.304  Government of Iran. The term "Government of Iran" includes:
(a) The state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof;
(b) Any entity owned or controlled directly or indirectly by the foregoing;
(c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and
(d) Any person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section.

provided material support, aided, abetted and executed acts of terror with the AAMB. All the named Defendants are agents and instrumentalities of Iran and Syria and essential participants in launching the deadly terrorist attacks, including the attack which injured Plaintiff and killed a member of her family. As such, Defendants are directly and jointly and severally liable for the injuries suffered by Plaintiff and should, therefore, be held accountable.

**COUNT I**

**CLAIM OF BATSHEVA SHOHAM**
**PURSUANT TO THE PROVISIONS OF 28 U.S.C. § 1605 and**
**§ 1605A AS AMENDED AND 16 D.C. CODE § 16-2701**

**WRONGFUL DEATH OF YEHUDA SHOHAM**

144.    Plaintiff, Batsheva Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

145.    The actions of Defendants as described above violated the provisions of 28 U.S.C. § 1605 and § 1605A as amended and 16 DC Code 16-2701.

146.    The Defendants, through their agents financed the attacks, and rendered material support to the activities of the AAMB that resulted in the serious injuries and subsequent death of five (5) month old Yehuda Shoham, son of Batsheva Shoham, on June 5, 2001 in a vicious attack in Israel. Those agents were at all times acting within the scope of their agency, and acted on and at the direction of the Defendants, who incited, financed, aided and abetted, conspired with and rendered material support and resources, training and expert advice and assistance to the terrorists responsible.

147.    Batsheva Shoham, a US citizen, as a direct and proximate consequence of the actions of members of the AAMB, for which the Defendants are vicariously, jointly and severally liable,

suffered pecuniary loss, including assistance to the beneficiary, the loss of future earnings and accretions to the Estate of Yehuda Shoham, medical care up until the time of death, and the funeral and burial expenses.

WHEREFORE, Plaintiff, Batsheva Shoham individually and as legal and personal representative/administrator of the Estate of Yehuda Shoham, demands judgment on behalf of herself and the Estate of Yehuda Shoham, jointly and severally, against Defendants, in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT II

### CLAIM OF BATSHEVA SHOHAM
### PURSUANT TO 12 D.C. CODE § 12-101 AND 28 U.S.C. § 1605A

### SURVIVAL CLAIM FOR DEATH OF YEHUDA SHOHAM

148.    Plaintiff,    Batsheva    Shoham    individually    and    as    legal    and    personal representative/administrator of the Estate of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

149.    The minor victim, Yehuda Shoham, from the time of injury until his death, suffered extreme bodily pain and suffering as a result of the actions described above which were undertaken by the agents of the Defendants.

WHEREFORE, Plaintiff, Batsheva Shoham individually and as legal and personal representative/administrator of the Estate of Yehuda demands judgments, jointly and severally, against the, Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

### CLAIM III

### CLAIM OF BATSHEVA SHOHAM

**PURSUANT TO 28 U.S.C. § 1605A AND
IN ACCORDANCE WITH FEDERAL AND STATE COMMON LAW**

**FOR ASSAULT**

150.   Plaintiff, Batsheva Shoham, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

151.   The members of  the AAMB as above alleged, intentionally and willfully placed the Plaintiff, in fear and apprehension of harm as a direct result of their actions including the psychological trauma and abuse they inflicted upon her, when they attacked the vehicle, in which she was a passenger, along with her husband and baby, and murdered her child. The willful, wrongful, and intentional acts of the AAMB were provided with material support and resources by Defendants, and the Plaintiff was injured in that he endured extreme mental anguish, injury and pain and suffering.

 WHEREFORE, Plaintiff, Batsheva Shoham demands judgment jointly and severally against Defendants, in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

**COUNT IV**

**CLAIMS OF BATSHEVA SHOHAM
PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO THE FEDERAL AND STATE
COMMON LAW FOR SOLATIUM AND INTENTIONAL INFLICTION AND NEGLECT
INFLICTION OF EMOTIONAL DISTRESS**

**SOLATIUM AND EMOTIONAL DISTRESS**

152.   Plaintiff, Batsheva Shoham individually and as personal represetntaive/administrator of the Estate of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

153.    As a direct consequence of the actions of the Defendants, the Plaintiff has suffered extraordinary grief and mental anguish, in that the Defendants, acting through their agents and co-conspirators, by their conduct intended through infliction of physical injury to the Shoham family which resulted in the serious injury and death upon her child, Yehuda Shoham, so as to cause severe emotional distress mental anguish, grief and bereavement upon, Batsheva Shoham, Yehuda Shoham's natural guardian at the time of the attack. Furthermore, as a direct consequence of the action of the Defendants, the Plaintiff has suffered the loss of her child's society and comfort.

154.    The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress of the attack on her person and on her family which resulted in the loss of a child, suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

155.    As a direct and proximate result of the intentional infliction of emotional distress and extreme and outrageous actions of Defendants, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, demands judgment jointly and severally against Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT V

## CLAIMS OF BATSHEVA SHOHAM AND ESTATE OF YEHUDA SHOHAM

## PUNITIVE DAMAGES PURSUANT TO 28 U.S.C. § 1605A

156.    Plaintiff Batsheva Shoham individually and as personal representative/administrator of the Estate of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

157.    The actions of the Defendants, as carried out by their agents the AAMB as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations (law of nations) and international law.  The loss of life as above described was intended as a result by each Defendant. The decedent was not engaged in war or in police duties, but was a civilian and a five month old baby.  The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. § 1605A, the estate of decedent is thereby entitled to punitive damages.

WHEREFORE, Plaintiff, demands judgments on behalf of herself and the Estate of Yehuda Shoham, jointly and severally, against Defendants, in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000) plus costs.

**COUNT VI**

**CLAIMS OF BATSHEVA SHOHAM AND ESTATE OF YEHUDA SHOHAM
PURSUANT TO**

**THE TORTURE VICTIMS PROTECTION ACT 1991 P.L. 102-256**

158. Plaintiff Batsheva Shoham on her own behalf and as personal representative/administrator of the Estate of Yehuda Shoham, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

159.    The action of the defendants as described above subjected the plaintiff to extrajudicial killing, attempted killing and torture within the meaning of the Torture Victims Protection Act 1991, Pub. L. 102-256, 106 Stat.

160.      In carrying out the extrajudicial act of killing, attempted killing and torture against the Yehuda Shoham child of Batsheva Shoham, the actions of each Defendant was conducted under

actual or apparent authority of under color of law, of the foreign nations of the Islamic Republic

of Iran and the Syrian Arab Republic.

161.    As a result of the defendants' violation of the TPVA, plaintiff suffered damages as fully

set forth in the paragraphs above which are incorporated herein by reference.

WHEREFORE, Plaintiff, Batsheva Shoham who is a US national and/or citizen demands

judgment in their favor against Defendants jointly and severally and demands damages in the

amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.


Dated: March 22, 2012

                                Respectfully submitted,

                                PLAINTIFF,
                                By Counsel


                                  /s/Gavriel Mairone
                                Gavriel Mairone, Esq.
                                MM~LAW LLC
                                980 North Michigan Avenue, Suite 1400
                                Chicago, IL 60611
                                Tel: (312) 253-7444
                                Fax: (312) 275-8590
                                taxlaw@mm-law.com


                                  /s/  Michael Miller
                                Michael Miller, Esq.
                                Bar No. 397689
                                The Miller Firm LLC
                                108 Railroad Avenue
                                Orange, VA  22960
                                Tel:  540-672-4224
                                Fax:  540-672-3055
                                Miller809@aol.com