**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BATSHEVA SHOHAM**<br>**Individually and as Administrator to the Estate of Yehuda Shoham** | ) | |
| **Plaintiff,** | ) | Case No. 1:12-cv-00508 (RCL) |
| v. | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** ***et al.*** | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT**

## I. INTRODUCTION

This action seeks damages for acts of state-sponsored terrorism that resulted in a June 5, 2001 terrorist attack upon Plaintiff Batsheva Shoham and her family as they were driving to their home in an Israeli village in the West Bank. This attack was carried out by the terrorist organization Fatah Tanzim, operating with material aid and support provided by the Islamic Republic of Iran and Bank Saderat (collectively "Defendants"). In the years leading up to the June 5, 2001 attack, Defendants, acting through its principals, aided and abetted and conspired with Fatah Tanzim to engage in acts of terrorism. Defendants provided this support to Fatah Tanzim with the knowledge and intent that such support would be used for terrorist attacks against Israeli and American citizens and interests.

Plaintiff brings this action pursuant to the provisions of the Foreign Sovereign Immunities Act, (FSIA), codified as 28 U.S.C. § 1602, *et seq*. The Court held a two-day hearing on liability and damages in accordance with 28 U.S.C. § 1608(e). The Court accepted evidence in the form of live testimony, affidavit, documentary and videographic evidence, as well as credible testimony from two well-qualified experts on Defendant's material support of terrorist organizations, including Fatah Tanzim. For the reasons set forth more fully below, Plaintiff is entitled to redress for their injuries under the FSIA.

## II. FINDINGS OF FACT

On June 5, 2001, Muayad Kafina ("Kafina") and other accomplices threw rocks at a vehicle driven by Batsheva and Binyamin (Benyamin) Shoham as they were driving home with their first born child, 5 month old Yehuda Shoham. One rock, described by Binyamin Shoham as the size of a small watermelon crashed through the windshield of the vehicle killing Yehuda. (Evidentiary Hearing, Testimony of Binyamin Shoham, April 7, 2016, ("Benny Testimony") at

158:14); Plaintiff's Exhibit 5; Police Report at 7, 11 (Photographs).

In his statement to the police, Kafina admitted to being a member of the Fatah-Tanzim terrorist organization and that he was recruited to the organization by Jamal Abdallah Khatib a Fatah-Tanzim leader in the village of Al-Sawiya. (Pl's Exhibit 3; Recorded Statement and Confession of Muayad Kafina, June 17, 2001)(Pl's Exhibit 7; Recorded Statement of Muayad Kafina, June 25, 2001); (Pl's Exhibit 1; Testimony of A'Atef Aweeda at 18:19-25). Kafina further admitted to committing similar attacks against Israeli vehicles in the same area with at least one of his accomplices, Saker Saleh, who also shot at Israeli vehicles with a gun.(Pl's Exhibit 3); (Pl's Exhibit 7; Recorded Statement: Muayad Kafina, June 25, 2001);

The district where the attack upon where the Shoham family occurred contains a strong Fatah presence; specifically in the village of Al Sawiya where the attackers were from. (Evidentiary Hearing, Testimony of Ido Zelkovitz; ("Zelkovitz Testimony") at 37:6-9). Most of the incidents that occurred against Israeli civilians in that area at the time were carried out by the Fatah-Tanzim (Pl's Exhibit 7; Testimony of A'Atef Aweeda page 33:6-14).

The Fatah-Tanzim operatives that engaged in terrorist attacks would receive financial rewards and promotions within the organization. (Zelkovitz Testimony at 33:19-25). For example, Fatah-Tanzim would pay its members a salary; pay family members of its operatives through a Martyrs Foundation established by Iran; and provide free medical care to injured operatives through Iran. (Zelkovitz Testimony at 34-38, 66-68).

**A. The Fatah-Tanzim Organization**

Fatah was established in 1959 by Yasser Arafat who served, until his death in 2004, as its head as well as the Chairman of the Palestinian Liberation Organization ("PLO") and later the President of the Palestinian National Authority ("PA") (Zelkovitz Testimony at 33:24-34:2;

38:16-25). Arafat served as the movement's chairman (and as President of the PA) until his death in 2004. (Zelkovitz Aff., p 5 fn 4.) From its inception, the organization promoted the Armed Struggle ideology among the Palestinians. (Pl's Exhibit 28; Affidavit of Ido Zelkovitz at p 4 fn 1).

In 1965, Fatah started to engage in terrorist attacks against Israeli targets. (Zelkovitz Testimony at 39:6-13). The members of Tanzim were made up of cells of Fatah-affiliated operatives organized to carry out the terrorist agenda of the Fatah organization. (Pl's Exhibit 32, IDF Military Intelligence Report, May 3, 2002). As confirmed by the US Department of State during the year of the Shoham attack: "Members of the Tanzim made up from small and loosely organized cells drawn from the street-level membership of Fatah conducted attacks against Israeli targets in the course of the year." (Pl's Exhibit 28; Zelkovitz Aff. at 13); *See also* State Department; Patterns of Global Terrorism 2001 at 56).

After the start of the Second Intifada on September 28, 2000, Fatah "military" operations in the West Bank and Gaza Strip were attributed to the Al Aqsa Martyrs Brigade ("AAMB"). . (P's Exhibit 28; Zelkovitz Aff. at 10). The establishment of the AAMB was an attempt by Fatah-Tanzim to gather all of the Fatah military groups under one umbrella. *Id*. As stated in the Patterns of Global Terrorism 2001 "The al-Aqsa Martyrs Brigade comprises an unknown number of small cells of Fatah-affiliated activists that emerged at the outset of the current intifada to attack Israeli targets." Patterns of Global Terrorism; 2001 at 88. The Tanzim and AAMB are the military and non-institutionalized faction of the Fatah Organization. (Pl's Ex. 28; Zelkovitz Aff. at 13). The AAMB belongs to Fatah-Tanzim and are considered by their members as "one of the same." *Id*. at 10-11; (Zelkovitz Testimony at 67:25-68:8).

During the relevant period of the Shoham attack, Marwan Barghouti was the commander

of both Fatah-Tanzim and the AAMB in the West Bank. (Pl's Exhibit 28; Zelkovitz Aff at p 12). Barghouti both funded the attacks and gave the orders to carry out the attacks. (Pl's Exhibit 28; Zelkovitz Affidavit at 20). Barghouti admitted that he was in charge of Fatah's terrorist activities in the West Bank and the leader of Fatah-Tanzim and AAMB operatives in the West Bank during the Second Intifada. (Exhibit 28; Zelkovitz Affidavit at 13). In 2004, Barghouti was sentenced by an Israeli court to five (5) lifetime imprisonments for his terrorist activities resulting in the murder of five people by Fatah-Tanzim. (Zelkovitz Testimony at 64) The court found that: (1) Fatah was the terrorist organization mainly responsible for the attacks in the West Bank (and Gaza) at the breakout of the Second Intifadal; and (2) Fatah-Tanzim and the AAMB was actually one organization using two names. (Exhibit 28; Zelkovitz Aff. at 12).

Barghouti sponsored, directly launched attacks and gave money with direct orders to Fatah-Tanzim activists. (Zelkovitz Testimony at 64:19-25) Barghouti funneled money to the field squads of the AAMB, to purchase weapons, and as to contribute to the activists' livelihoods.[1] (Pl's Exhibit 28; Zelkovitz Aff. a 20). Barghouti admitted during in his interrogation that besides being a political leader, he was in charge of Fatah's military issues and defined himself as being in charge of all activities of the Fatah-Tanzim in his region. *Id.* at 13. Testimony by an expert witness from the IDF Intelligence at Barghouti's trial corroborated that Fatah Tanzim spearheaded the terror attacks during the Second Intifada, that the AAMB is a cover name for those terror cells of Fatah who claim responsibility for terrorism and that the Tanzim and the AAMB are the military and non-institutionalized faction of the Fatah organization (Pl's Exhibit 28; Zelkovitz Aff. at 13).

**B. Defendants Provided Material Support to Fatah Tanzim**

The government of the Islamic Republic of Iran ("Iran") has a long and established

[1] *State of Israel v. Marwan Barghouti*, Verdict, 1158/02, pp, 19-36.

history of providing material aid and support to terrorist organizations. The United States Department of State ("State Department") has continuously listed Iran as a state sponsor of terrorism since 1985. During the period of 1993 to 2004, the United States considered Iran "the premier state sponsor of terrorism" and "the most dangerous sponsor and the greatest source of concern to U.S. policymakers." *Id*. at 8-10; (Patterns of Global Terrorism 2001); (Patterns of Global Terrorism, 2002); (Patterns of Global Terrorism, 2003); and (Patterns of Global Terrorism, 2004).

The relationship between Fatah and Iran dates back to the 1970's when Fatah had an infrastructure in Sidon, Lebanon. (Zelkovitz Testimony at 39:16-17) . When the Khomeini opposition to the Shah began, Khomeini sent Mujahideen, (holy warriors) to train in the Fatah military camps in Sidon, Lebanon. In 1974 when Khomeini became the supreme leader of the Islamic Republic of Iran, he issued a fatwa that Fatah's struggle against Israel must be considered as jihad or a holy war and all Muslims must take part in this struggle against Israel. (Zelkovitz Testimony at 40:10-16).

Yasser Arafat was the first Arab leader to visit Iran's Supreme Leader Khomeini after the Islamic Revolution in 1979. (Zelkovitz Testimony at 42:23-43:10); (Pl's Ex. 28; Zelkovitz Aff. at 4). Shortly thereafter, Khomeini proclaimed an annual, international al-Quds day designed to bring together the Palestinians and Iranians in an effort to destroy Israel. *Id*. at 42:3-14; (Pl's Ex. 28; Zelkovitz Affidavit at 5). Fatah provided military and arms training to members of the Islamic resistance movement. (Pl's Ex. 28; Zelkovitz Aff. at 7). For example Mohamad Montazeri, one of the founders of Iran's Islamic Revolutionary Guard Council, was trained in a Fatah camp in Lebanon. (Pl's Exhibit 28; Zelkovitz Aff. at 8). The

training provided by Fatah was pivotal to the establishment of Hezbollah. *Id*. at 7.[2]

Iranian support of Fatah-Tanzim substantially increased after the breakout of the Second Intifada on September 2, 2000. (Pl's Ex. 28; Zelkovitz Aff. at 16).[3] At this time, Fatah, Arafat's ruling party, started to directly engage in terrorism through its military wing Fatah-Tanzim. Iran recognized this opportunity and promoted cooperation with Fatah-Tanzim. *Id*. at 19. On October 20, 2000, Iran's Supreme Leader Ali Khamenei announced:

> We regard Palestinians as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people . . . The Palestinian people must continue the blessed Jihad and its standing against the enemies of Islam . . . The Hamas, Islamic Jihad **and Fatah forces** must continue the struggle in a united way . . . But, indeed, the only solution [to the crisis in the region] is the elimination of the root of this crisis, which is the Zionist regime imposed on the region.

(Pl's Ex. 33; ¶¶ 38-39, 41-42)(emphasis added).

Iran materially supported Fatah-Tanzim by providing money, weapons, guidance, and recruitment assistance. (Pl's Ex. 28; Zelkovitz Aff. at 20). Iran used its proxy Hezbollah to transfer money to Fatah-Tanzim operatives. *Id*. at 16-17. Hezbollah was providing this support at the direction of the Iranian government. (Zelkovitz Testimony at 70:16-24). During the Second Intifada, Iran provided Fatah with millions of dollars worth of money and weapons. (Zelkovitz Testimony at 62:1-10).[4] Several attempts at weapons shipments by Iran to Fatah were intercepted by Israel: the *Santorini* in January 2001, the *Karine A*, in January 2002, and the *Abu*

---

[2] Imad Mughniyeh, the mastermind of the 1983 Marine Barracks bombing, was trained in a Fatah camp prior to joining Hezbollah in 1983. (Pl's Ex. 28; Zelkovitz Aff. at 7).
[3] The Second Intifada began on September 28, 2000 and continued until the end of 2004. (Zelkovitz Testimony at 51:3-18).
[4] In January 2001, Israel intercepted a major arms shipment that Iran was attempting to provide to the Palestinian Authority. The ship contained weapons such as anti-tank launchers, anti-aircraft missiles, mortars, rockets and anti-tank grenades. The crew members upon the ship known as the Santorini, admitted that three (3) prior arms shipments were successfully delivered to the Palestinian Authority. (Zelkovitz Testimony at 59-60). Israel intercepted two additional arms shipments in 2001 and 2002. *Id*.

*Hassan* in May 2003. According to the Israeli Ministry of Foreign Affairs, "The interrogation of the Karine A crew indicates that Iran was directly involved in supplying quality arms to the Palestinian Authority."[5] (Pl's Exhibit 28; Zelkovitz Aff. at 19-20); (Zelkovitz Testimony at 60:14-15).

The Iranians created a direct channel with the PA and Fatah leadership that were managed by Arafat's financial advisor and one of his closest advisors, Fuad Shubaki. Fuad Shubaki was in charge of finances for the Palestinian Authority's General Security Service. He was convicted by an IDF military court of: purchasing weapons and maintaining contacts with Iran in order to promote cooperation between Iran and the PA; transferring weapons from Hezbollah in Lebanon in the Karine A affair (carrying 50 tons of weapons), and for organizing military training for PA members in Lebanon and Iran. (Pl's Exhibit 28; Zelkovitz Aff. at 19-20, footnote 50); (Zelkovitz Testimony at 60:14-15).

Iran also used Hezbollah to train Fatah military squads in conducting acts of terrorism. *Id*. Iran maintained a "Martyrs Foundation" intended to encourage Fatah activists to establish a relationship with Iranian and Hezbollah operatives, knowing that if any were killed, their families would be provided for by Iran/Hezbollah. (Pl's Ex. 28; Zelkovitz Aff. at 27). Iran provided the critical support during the Second Intifada as they wanted to assert control over Fatah-Tanzim and disrupt the peace process. (Zelkovitz Testimony at 58:18-59:10).

Fatah-Tanzim relied on the money and support provided by Iran. *Id.* at 70:25-71:13. The primary districts within the West Bank that received Iranian funds were Jenin and Nablus: the region in which the attack upon the Shoham family occurred. (Zelkovitz Testimony at 36:14-37:8). The link between Iran, Hezbollah and Fatah-Tanzim in this area was Munir al-Maqdah

[5] Israel Ministry of Foreign Affairs, Iran and Syria as Strategic Support for Palestinian, September 30, 2002, par. 63.

("Maqdah"). (Zelkovitz Testimony at 51:2-5).

Iran transferred money directly to Fatah members that operated under the umbrella of the Al Aqsa Martyr's Brigade. (Pl's Exhibit 28; Affidavit Zelkovitz p 20). The contact person was Maqdah a Fatah general and commander of the Fatah military force in the refugee camp of Ain al Hilwa in Lebanon. *Id.* Maqdah had no financial sources of his own for financing the Fatah-Tanzim operatives and its "large-scope terrorist activity." (Pl's Ex. 33, ¶ 39). The funds necessary to continue the attacks in the West Bank came directly from Iran. *Id.*; (Zelkovitz Testimony at 59:13-25). At the time of the Second Intifada, Maqdah developed a channel of money to the West Bank, going specifically and directly to the Fatah/Tanzim/AAMB infrastructure that were located in the Jenin and Nablus area. (Zelkovitz Testimony at 35:10-15); (Pl's Exhibit 28; Zelkovitz Aff. at 20). Maqdah was used by Iran and Hezbollah as a conduit to the Fatah-Tanzim activists. Maqdah admitted publically on several occasions that he received money from Hezbollah (Zelkovitz Testimony at 35:16-23; 38).[6]

The district of Nablus and Jenin were the main areas that received the Iranian funds. The person who received the Iranian funds from Lebanon and distributed it amongst the Fatah-Tanzim members was Jamal Mustafa Huweil ("Huweil") who served as a Fatah-Tanzim leader in the Jenin district and the treasurer of AAMB. (Zelkovitz Testimony at 36); (Pl's Exhibit 28; Zelkovitz Aff. at 20). A 2002 Israeli military court indictment of Huweill, based on the information he provided in his police statement, stated that Huweill received about $30,000 from Maqdah and named ten Fatah/Fatah Tanzim/AAMB operatives to whom he transferred these funds.[7] The perpetrators of the Shoham attack were from the Nablus region – from a village

[6] Iran actively supports Hizbollah's involvement in the Palestinian-Israeli conflict and the organization's aid to Palestinian militants. *See* Jorisch Affidavit, April 2016 at 4

[7] Indictment, IDF v. Jamal Mustafa Huweill, 6041/02, pp. 2-3. The case resulted in a plea bargain therefore no verdict was issued.

called Al Sawiya. The money that the Jenin and Nablus would receive would be diffused among activists, to finance future terror attacks and to buy ammunitions and arms. (Zelkovitz Testimony 38:5-16)[8]

Mahmud Aweiss (Awais) was the commander of both Fatah-Tanzim and of the AAMB in the Nablus and the Northern Samaria areas at the time of the attack. Pl's Exhibit 28; Zelkovitz Aff. at 21-23). At his trial Aweiss admitted that he was a "member of AAMB that belongs to Tanzim-Fatah" and that his operations were funded by Fatah Tanzim members from the West Bank and Lebanon, specifying that he received $50,000 from Maqdah. (Zelkovitz Affidavit Page 22-23) *State of Israel v. Nasser Aweiss*, Verdict, 1137/02 p. 18.

The chief commander of the AAMB in the Jenin region publicly stated that without the help and assistance of Iran, through Hezbollah, the organization could not have succeeded in their terrorist operations. (Zelkovitz Testimony at 68-69); (Pl's Ex. 28; Zelkovitz Aff. at 18).

**1. Iran's Use of Al-Manar Television to Provide Material Support to Fatah-Tanzim by Way of Incitement and Encouragement to Commit Acts of Terror**

Iran materially supported and financed al-Manar during the Second Intifada. (Jorisch Aff., p. 131). Al-Manar is a television station funded by Iran and owned and operated by Hezbollah. (Evidentiary Hearing, Testimony of Avi Jorisch, April 7, 2016 ("Jorisch Testimony") at 85:20-86:7). The purpose of al-Manar was to serve as the mouthpiece for Hezbollah and Iran. *Id*. at 104:3-8. Iran used al-Manar to incite and encourage terrorist attacks against Israeli civilians during the Second Intifada. *Id*. at 102:18-103:5.

The programming of al-Manar become much more violent in response to the Second Intifada and soon became the number one watched station in the Arab world. *Id.* at 111:12-

[8] Both Awais and Akhwail /Huweill are currently imprisoned in Israel- Zelkovitz Testimony p 36:25

112:25.[9] The programming was broadcast throughout the Palestinian territories including the very location of the attack that killed Yehuda Shoham. *Id*. at 112:11-15. Iran encouraged Palestinians in the West Bank to engage in rock throwing as an effective means of terrorism upon Israel. *Id*. at 117:10-21 Al-Manar was the first venue for Palestinians to claim their attack and would broadcast where demonstrations were to take place. (Jorisch testimony, p. 107). Al-Manar station officials who worked in the Palestinian territories helped organize attacks. *Id*.

Terrorist organizations, such as Fatah-Tanzim, would use al-Manar to expound their view and encourage their members to engage in terrorist attacks. *Id*. at 115:6-22. Fatah-Tanzim used al-Manar to broadcast its attacks to a large audience in the West Bank and Gaza Strip. *Id*. at 122:3-123:9. The image of the glorification of rock throwing shown repeatedly on Al Manar with senior Iranian-backed leaders encouraging the use of rocks, bullets and other means to kill as many Jews as possible was constant. *Id*. at 128. The commercials and programming played and replayed on Al Manar were effective in inciting terrorism against Israeli citizens in 2001 during the Second Intifada. (Jorisch Testimony at 125, 126). This material support was effective in inciting terrorism against civilians in the year 2001 and resulted in exponentially more attacks upon civilians. *Id*. at 125:25-126:10; 131:14-20.

### C. Bank Saderat, as an Agent And Instrumentality of Iran, Provided Material Support and Resources to Fatah-Tanzim

Bank Saderat was established in 1952 and became a commercial state-owned bank of Iran in 1979. On October 25, 2007, the United States Treasury Department designated Bank Saderat as a Specially Designated Global Terrorist as well as an affiliate of the Iranian Revolutionary Guards Corps and an Iran-linked financial institution. (Affidavit of Avi Jorisch; Bank Saderat (September 2016) ("Saderat Aff.") at ¶ 13).

[9] Al-Manar has 25 million viewers. (Jorisch testimony, p. 101).

Iran would transfer hundreds of millions of dollars to various terrorist groups each year, including approximately $200 million to Hezbollah each year. (Pl's Ex. 28; Zelkovitz Aff. at 16). Iran used the state-owned Bank Saderat as an effective means to transfer money to terrorist organizations. After the breakout of the Second Intifada, Iran provided Hezbollah over $50 million through an account at Bank Saderat. (Zelkovitz Testimony at 62:7-10). Hezbollah used these funds, in part, to fund Maqdah and Fatah-Tanzim's terrorist activities in the West Bank. *Id.* at 62:11-22.

On August 3, 2010, the U.S. Department of the Treasury identified 21 entities in Iran's banking, insurance and other industries determined to be owned or controlled by the Government of Iran. (Saderat Affidavit ¶ 14). Bank Saderat was listed as one of the owners of one of the listed 21 entities and included the details of the 2006 designation of the bank by OFAC, as following: "In 2006, OFAC identified Bank Saderat Iran as a financial institution owned or controlled by the Government of Iran. Furthermore, Bank Saderat Iran was designated on October 25, 2007 pursuant to Executive Order 13224 for its support of terrorism-related activities." *Id.* ¶ 14.

In a page from the US Department of Treasury's website (February 14, 2012) an example regarding Bank Saderat was included as follows: "Note that many entries on the SDN List have more than one tag. For example: Bank Saderat Iran has three tags: [SDGT], indicating that it has been sanctioned for providing services to terrorism; [IRAN], indicating that it is the Government of Iran; and [IFSR], referring to the Iranian Financial Sanctions Regulations to signal to third country financial institutions that engage with entities with this tag that they risk sanctions under CISADA." (Saderat Affidavit ¶ 15).

In 2009, Iranian President Ahmadinejad announced a program to privatize Bank Saderat.

The program has been a sham, resulting in the transfer of government owned businesses to entities owned by the IRGC and Iranian government officials. As of 2012, 27.7% of the bank's shares were owned directly by the Iranian government while 40% of the bank's shares were owned by the "Provincial Investment Group" a wholly-owned entity of the Iranian government. (Saderat Affidavit at ¶ 20). The Iranian Privatization Organization is affiliated with the Ministry of Economic Affairs and Finance and is administered as a "State Owned Enterprise." (Saderat Affidavit at ¶ 21). As of June 9, 2011, Bank Saderat remained an Iranian government-owned and controlled bank and an instrumentality of the Islamic Republic of Iran. (Saderat Affidavit at 9).

### D. Fatah-Tanzim Was Responsible for the Murder of Yehuda Shoham

Plaintiff Batsheva Shoham ("Batsheva") is a citizen of the United States who has lived in Israel for the majority of her life. (Evidentiary Hearing, Testimony of Batsheva Shoham, April 8, 2016 ("Batsheva Testimony") at 6:8-14); (Pl's Ex. 26; Batsheva Shoham Passport). In 1998, Batsheva married her husband Binyamin "Benny" Shoham ("Benny") and moved to Israel. (Batsheva Testimony at 8:8-10). There was one major road connecting their village to both Jerusalem and Nablus. (Evidentiary Hearing, Testimony of Binyahim Shoham, April 7, 2016, ("Benny Testimony") at 144:23-25). . at 142:1-5.

On the night of June 5, 2001, Batsheva, Benny and their five month old son Yehuda were traveling home along the main road to their residence. Benny was driving while Batsheva was sitting in the back seat next to Yehuda. (Batsheva Testimony at 17:7-12). As Benny was driving past the Palestinian village of Al Sawiyya, he saw something thrown in the direction of the car from behind a set of bushes. (Evidentiary Hearing, Testimony of Binyahim Shoham, April 7, 2016, ("Benny Testimony") at 144:23-25). The object crashed through the front windshield on

the passenger side of the car and into the back seat. *Id*. at 145:19-23. The object was a big boulder, approximately the size of a watermelon. *Id*.. at 145:13-18; (Pl's Exhibit 5 at 7).

Batsheva was falling asleep when she heard the crash of the boulder and woke to see a lot of smoke. (Batsheva Testimony at 17:15-23). Batsheva could not see or hear Yehuda. *Id*. at 18:13-18. After a few hundred meters, Benny stopped the car to check on Yehuda. (Benny Testimony 146:23-147:2). Batsheva noticed that Yehuda had blood on his head and was not breathing. (Batsheva Testimony at 18:19-25). Batsheva immediately began performing CPR on Yehuda. *Id*. After several minutes of CPR, Yehuda threw up and started groaning and make squeaking sounds. *Id*. at 19:10-16; (Benny Testimony at 148:5-8). Benny called for help and an ambulance arrived in approximately ten (10) minutes. (Batsheva Testimony at 20:10-12). As they were waiting for the ambulance, Batsheva kept her hand on Yehuda to make sure he was breathing. *Id*. at 20:4-9.

The ambulance arrived at the hospital approximately forty (40) minutes after the attack. *Id*. at 21:8-10. Yehuda was unresponsive, his skull was broken and his head was extremely swollen. *Id*. at 151:21-4; 152:3-6. On June 11th, the sixth day after the attack, Yehuda died. (Benny Testimony at 154:14-17); (Batsheva Testimony at 23:20-21).

Fatah-Tanzim was responsibile for the June 5, 2001 attack that killed Yehuda. (Zelkovitz Testimony at 31:9-14). Muayad Kafina ("Kafina") a member of Fatah-Tanzim, admitted that he was recruited to the terrorist organization by Jamal Abdallah Khatib a Fatah-Tanzim leader in the village of Al-Sawiya. (Pl's Exhibit 3; Recorded Statement and Confession of Muayad Kafina, June 17, 2001)(Pl's Exhibit 7; Recorded Statement of Muayad Kafina, June 25, 2001); (Pl's Exhibit 1; Testimony of A'Atef Aweeda at 18:19-25). On the day of the attack, Kafina and two others traveled to a location approximately two meters from the road. (Pl's Exhibit 3 at 2).

Kafina admitted that they proceeded to fire shots from a pistol and throw large rocks at Israeli vehicles that were passing along the road. *Id*. (Pl's Exhibit 7 at 1-2). The Fatah-Tanzim members were able to identify the Israeli vehicles by the color of the license plate. (Pl's Exhibit 1; Testimony of A'Atef Aweeda at 19:13-24).

Stone-throwing is a well-known mode of operation for Fatah-Tanzim operatives. Tr. at 31:17022; (Pl's Exhibit 1; A'Atef Aweeda at 32:16-25). A'Atef Aweeda, the Deputy Commander of the Anti-Terrorism Department within the Israeli police testified that Fatah-Tanzim frequently carried out similar attacks against civilians during the Second Intifada. (Pl's Exhibit 1 at 32:2-33:14). Fatah-Tanzim would provide direction to its operatives as to exact locations to attack Israeli civilians in the West Bank. (Zelkovitz Testimony at 74:13-24). The attack upon the Shoham family was typical of a Fatah-Tanzim ordered attack. Id. at 75:12-18.

On June 11, 2001, Yehuda died from the blunt head trauma caused by the rock thrown by the Fatah-Tanzim members. (Exhibit 14; Testimony of Dr. Yuval Meroz at 32:7-25); (Pl's Exhibit 16 at 3). Upon investigation, Yehuda's car seat had marks of stone, glass and blood and there was infant hair on the rock. (Pl's Exhibit 5 at 15). Kafina admitted that he was responsible for throwing the rock that hit the Shoham's vehicle. (Pl's Exhibit 1 at 16:2-22).

1. **Plaintiff Batsheva Shoham Has Suffered Severe Emotional Distress As a Result of the Murder of her 5 month old son.**

Batsheva continues to suffer severe emotional distress from the attack that murdered her first born son over fifteen (15) years ago. Batsheva "always loved kids" and became a kindergarten teacher shortly after she was married. (Batsheva Testimony at 9:1-12). Batsheva always wanted a child of her own, however, she suffered two miscarriages in the years immediately following her marriage to Benny. *Id*. at 10:5-11. The miscarriages were very hard on Batsheva as she blamed herself for the inability to start their family. (Benny Testimony at

137:13-17; 138:14-21). In 2000, Batsheva became pregnant again and was able to give birth to their first born child. The Shoham's named their son, Yehuda, meaning "thank you.". *Id*. at 138:22-25.

Yehuda was "everything" to Batsheva and her husband. *Id*. at 138:8-13. Batsheva used every moment she had to be with him." *Id*. at 140:2-7; (Batsheva Testimony at 13:14-18). Yehuda was a very relaxed baby that had "a smile that made everybody happy." (Batsheva Testimony at 13:8-13).

Batsheva never left the hospital during the six days of Yehuda's hospitalization. (Benny Testimony at 152:20-23)(Batsheva Testimony at 25:2-16). The Shoham's were told that there was very little hope that Yehuda would survive. *Id*. at 23:22-24:1. Despite his condition, Batsheva remained hopeful. *Id.* at 24:18-25:1.

Yehuda's death shattered Batsheva's entire world. *Id*. at 28:2-12. It is still difficult for Batsheva to see her nephew who was born within a month of Yehuda as she imagines what Yehuda would be doing if he was still alive. *Id*. at 29:8-25. Although Yehuda now has seven children she is constantly brought back to the memory of Yehuda. *I*d. at 30:9-14. She always remembers Yehuda's "smile and happiness." *Id*. at 37:15-17.

The dramatic effect on the life of Batsheva continues until this day. As she described in her own words:

> Whenever I see a small child, it brings me back to the time of Yehuda. Also, as a mother, my children see me crying once in a while. I try to run a normal family, but certain things aren't quite normal. Certain things make me cry. I don't always know what it is exactly.

*Id*. at 36:21-37:6. Batsheva still keeps a box of Yehuda's items including a pacifier, a pair of socks and a bottle of soap that reminds her of his smell. Id. at 33:4-25. Batsheva has never been

to Yehuda's burial site as it is "too painful." Id. at 34:5-9. When Batsheva drives on the road where the attack occurred she pictures the night when Yehuda was injured. *Id*. at 32:19-33:1.

The loss of Yehuda had an effect on Batsheva's marriage making it difficult for her to communicate with their other children. *Id*. at 161:13-17. Batsheva, Benny and their oldest son have all been to therapy to deal with the emotional distress related to Yehuda's death. *Id*. at 32:1-15; 34:10-20. Neither therapy nor the passage of time will ever take away the emotional damage suffered by Batsheva from personally witnessing the death of her five month old son.

## III. STANDARD OF REVIEW FOR ENTRY OF DEFAULT JUDGMENT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); 28 U.S.C. 1608(e). The standard for evaluating claims under the FSIA and § 1608 is identical to the standard for entry of default judgment against the United States in Fed. R. Civ. P. 55(d). *Hall v. Republic of Iraq*, 328 F. 3d 680, 683-84 (D.C. Cir. 2003). "When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korean*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014).

In evaluating plaintiffs' proof, the Court should "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). "This Court accepts the uncontested evidence and testimony submitted by plaintiffs as true in light of the fact that the defendants in this action have not objected to it or even appeared in this action to contest it." *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125

(D.D.C. 2007). In default judgment cases, plaintiffs may present evidence in the form of affidavits. *Moradi*, 77 F. Supp. 3d at 65; *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012*); Kim v. Democratic People's Republic of Korea*, 774 F. 3d at 1050 (relying on affidavits of plaintiffs experts in finding that evidence was satisfactory to the court). Further, courts may take judicial notice of evidence presented in earlier litigation without necessitating the formality of having that evidence reproduced. *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 116 (D.D.C. 2012).

## IV. THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS

Courts may exercise personal jurisdiction over a foreign state or political subdivision of the foreign state, where the defendant is properly served in accordance with 28 U.S.C. § 1608. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148 (D.D.C. 2011). The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision. Fed. R. Civ. P. 4(j)(1). The FSIA prescribes four methods of service:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular

> Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

**A. Plaintiff Properly Served Bank Saderat**

On February 13, 2013, this Court granted Plaintiff's motion to allow substitute service on Bank Saderat by sending a copy of the summons and complaint by registered mail, return receipt requested to Bank Saderat's location in Paris, France. ECF 26 at 8. The Court concluded that direct service on Bank Saderat at its location in France would be "reasonably calculated to give actual notice" as required under 28 U.S.C. § 1608(b)(3)(C). *Id*. at 8. The Court further held that France, a signatory to the Hague Convention, has not objected to service via international mail. *Id*. at 9. Accordingly, the Court ordered that Plaintiff make substitute service on Bank Saderat pursuant to § 1608(b)(3)(C) "by serving a summons and copy of the Complaint (both documents prepared in English and Farsi) by registered mail, return receipt requested, through the Clerk of the Court" through its location in France. *Id*. at 10.

On August 5, 2014, Plaintiff requested that the clerk of court send a copy of the summons, complaint, and notice of suit, along with Farsi translations to Bank Saderat's branch in Paris, France by Federal Express. ECF No. 59. The clerk of court issued a renewed summons and mailed copies of these documents to Bank Saderat on that same day. ECF No. 61. Bank Saderat signed for and accepted service of the summons and complaint on August 8, 2014. ECF No. 62-1.

**B. Plaintiff Properly Served the Islamic Republic of Iran**

On March 18, 2013, Plaintiff mailed two copies of the summons, complaint and notice of suit along with translations of each to the United States Department of State (to the attention of

the Director of Special Consular Services) for service through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4). ECF No. 30.

The United States Department of State confirmed on May 10, 2014 that the Islamic Republic of Iran was served with the pleadings on April 12, 2013. ECF No. 40. Additionally, the Iranian Defendants were served with a diplomatic note of transmittal that specifically stated:

> [U]nder U.S. law any jurisdictional or other defense including claims of sovereign immunity must be addressed to the court before which the matter is pending, for which reason it is advisable to consult an attorney in the United States. Otherwise proceedings will continue without an opportunity to present arguments or evidence.

22 C.F.R. 93.1(d); ECF No. 25-1 at 11. The Iranian Ministry of Foreign Affairs refused the Plaintiff's documents on April 21, 2013. ECF. No. 40-1 at 5.

In the case of service under 1608(a)(4) "service shall be deemed to have been made…as of the date of ***transmittal*** indicated in the certified copy of the diplomatic note." 28 U.S.C. 1608(c)(1)(emphasis added). Therefore, service was proper under 1608(a)(4) despite the return of documents" by the Iranian Ministry of Foreign Affairs. *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 64 (D.D.C. 2015)(finding that service was proper despite the fact that the Iranian Ministry of Foreign Affairs refused the documents being served pursuant to 28 U.S.C. 1608(a)(4)); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 11 (D.D.C. 2009)(same); *Kapar v. Islamic Republic of Iran*, 105 F. Supp. 3d 99, 108 n. 2 (D.D.C. 2015)(same).

On September 16, 2013, the Clerk of Court entered default against the Islamic Republic of Iran. ECF No. 47. The Clerk of Court entered a default judgment against Bank Saderat on April 9, 2015. ECF No. 65. Plaintiff now seeks entry of judgment on the default judgments entered against Iran and Bank Saderat.

## V. THE COURT MAY ASSERT SUBJECT MATTER JURISDICTION OVER THIS CASE

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over civil actions against foreign state defendants. 28 U.S.C. §§ 1330, 1602-1611. A federal district court may obtain jurisdiction over a foreign sovereign where one of the FSIA's enumerated exceptions applies.

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7). Significantly, 1605A created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for acts committed by the State and its agents. Despite the significant changes in the law, however, the requirements for the Court to assert its subject matter jurisdiction over this case have not changed. *See* 28 U.S.C § 1605A(a)(1), (a)(2).

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow Plaintiffs to seek money damages for personal injury or death if the damages were caused by:

1. the providing of "material support or resources"[10] for an act of hostage taking, torture, or an extrajudicial killing;
2. engaged in by an official while acting within the scope of his office;
3. the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

[10] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

4. the claimant or the victim was a "national of the United States."[11].

28 U.S.C. § 1605A(a)(1), (a)(2). As set forth below, Plaintiff satisfies each of the requirements for subject matter jurisdiction. First, Defendants were designated as state sponsors of terrorism at the time of the March 7, 2002 terrorist attack. Second, Plaintiff's injuries were caused by acts of "extrajudicial killing" and the provision of "material support" to Fatah Tanzim. Third, Plaintiff Batsheva Shoham was a United States national at the time of the attack.

**A. Plaintiff's Injuries Were Caused by an Act of Extrajudicial Killings and Defendants' Provision of Material Support To Fatah Tanzim.**

Immunity under the FSIA is not appropriate where "money damages are sought against a foreign state for personal injury or death that was caused by an act of extrajudicial killing…or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee or agent or such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605A(a)(1).[12]

Plaintiff' proved beyond her burden under 28 U.S.C. § 1608(e) that Defendants provided material support and resources to Fatah Tanzim for acts of terrorism, including extrajudicial killings. With the support of Defendants, Fatah Tanzim killed Plaintiff's five month old son, Yehuda Shoham. It is undisputed that the June 5, 2001 terrorist attack "was planned by members of [the terrorist organization] and there has been no evidence that the attack was sanctioned by

[11] Subject matter jurisdiction is also appropriate in cases where the claimant or the victim was a "member of the armed forces" or "otherwise an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government." 28 U.S.C. § 1605A(a)(2).

[12] Extrajudicial killing means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized peoples. 28 U.S.C. § 1605A(h)(7); 28 U.S.C. § 1350.

any judicial body – legitimate or otherwise.” *Beer v. Islamic Republic of Iran*, 2010 WL 5105174 (D.D.C. 2010). Such acts of terrorism are contrary to the guarantees “recognized as indispensable by civilized persons.” *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011). Thus, the June 5, 2001 terrorist attack constitutes an “extrajudicial killing.” *Id.*; *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012)(suicide bombing constitutes an extrajudicial killing).

The Court “has determined that ‘the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning’” of the FSIA state-sponsored terrorism exception. *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 182-83 (D.D.C. 2010); *In re Terrorism Litig.*, 659 F.Supp.2d 31, 42 (D.D.C. 2009). “Thus, where a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute.” *Id.*

There is no “but-for causation requirement under the FSIA; proximate causation is sufficient.” *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 75 (D.D.C. 2010). Proximate cause may be established by a showing of a “reasonable connection” between the material support provided and the ultimate act of terrorism. *Owens*, 826 F. Supp. 2d at 151. Here, the expert testimony establishes that Defendants routinely provided financial assistance to Fatah Tanzim and other terrorist groups during the period of the Shoham attack.. The evidence proves that defendants: (1) provided substantial support to Fatah Tanzim through provision of money, communications equipment, and training; and (2) encouraged the escalation of terrorist activities against Israeli targets. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C.

2015)(finding that these same acts "have a reasonable connection to an attack carried out by Hamas in 2001). "This is sufficient for the relatively low proximate cause bar imposed by the FSIA." *Id*. at 394.

Under such circumstances, Defendants may be held liable for the acts of Fatah-Tanzim under the state-sponsored terrorism exception and the imposition of vicarious liability under 28 U.S.C. §1605A(c).

**B. Defendants Were Designated As State Sponsors of Terrorism at the Time the Action Was Filed.**

Plaintiff has complieds with 28 U.S.C. § 1605A(a)(2)(A)(i)(II) as each of the Defendants were designated state sponsors of terrorism at the time of filing. The term "state-sponsor of terrorism" is defined by statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

Iran was formally designated a "state sponsor of terrorism" on January 19, 1984 in accordance with section 6(j) of the Export Administration Act of 1979; 50 U.S.C. App. 2405(j), *see also* 49 Fed. Reg. 2836-02 (statement of Secretary of State George P. Schultz), and continues to this day to be designated as a state sponsor of terrorism.

Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act ("EAA"). 50 App. U.S.C. § 2405(j)(4). Iran has ever been taken off of the list of state sponsors of terrorism, pursuant to the EAA. As the terrorist attack in this case

occurred on March 7, 2002, the requirements set forth in 28 U.S.C. § 1605A(a)(2)(A)(i)(II) are satisfied.

**1. As an Instrumentality or Agency of Iran, Bank Saderat Is Considered A Foreign State Under the FSIA**

A foreign state "includes a political subdivision of a foreign state or any agency or instrumentality of a foreign state…" 28 U.S.C. § 1603(a). An "agency or instrumentality" means any entity: (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of the United States…nor created under the laws of any third country. 28 U.S.C. § 1603(b).

"The FSIA's legislative history suggests that Congress intended the terms 'organ' and 'agency and instrumentality' to be read broadly." *Intelstat Global Sales v. Community of Yugoslav Posts*, 534 F. Supp. 2d 32, 35 (D.D.C. 2008); *quoting Gates v. Victor Fine Foods*, 54 F. 3d 1457, 1460 (9th Cir. 1995). Section 1603(b) "requires that instrumentality status be determined at the time suit is filed." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

Bank Saderat remained an Iranian government-owned and controlled bank of the Islamic Republic of Iran at the time Plaintiff filed suit in June 2011. *See* Affidavit of Avi Jorisch at 9. The privatization of Bank Saderat in 2009 was a sham that amounted to "merely an assignment of dividends to 'worthy persons' for a limited period." *Id.* at 9. As of June 9, 2011, at least 67.7% of Bank Saderat's shares were owned and controlled by the Iranian government. *Id*. at 10. As Iran owned the majority of shares in June 9, 2011, Bank Saderat is considered an instrumentality of the Iranian government.

### C. Plaintiff's Claims Meet the Requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) as Plaintiff Was A Citizen of the United States at the Time of the Attack.

In order to assert subject matter jurisdiction under 1605A either *the victim or claimant* must be a U.S. national, a member of the armed forces, or "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government" at the time of the act of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(ii)(emphasis added). The term "national of the United States" is defined by 8 U.S.C. § 1101(a)(22) and includes (1) "a citizen of the United States" and (2) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.[13]

Plaintiff Batsheva Shoham is a United States citizen and was a citizen at the time of the June 5, 2001 terrorist attack. A valid United States passport and "Certificate of Birth Abroad" issued by the Secretary of State shall constitute conclusive proof of United States citizenship. 22 U.S.C. § 2705; *See also* 22 U.S.C. 212 ("No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States."). At no time did Plaintiff ever intend to relinquish her United States citizenship. *See Parness v. Shultz*, 669 F. Supp. 7 (D.D.C. 1987). Accordingly, Plaintiff has a valid cause of action under § 1605A for intentional infliction of emotional distress. *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008)(finding that family members who were United States citizens at the time of an attack had valid claims under 1605A even though the victim was not a U.S. national.).

## VI. DEFENDANTS ARE LIABLE FOR PLAINTIFF'S INJURIES

Plaintiff's claim is brought under section 1605A(c). This newly created federal cause of

---

[13] See 1605A(h)(5)("the term 'national of the United States' has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

action authorizes claims against state sponsors of terrorism to recover compensatory and punitive damages for personal injury or death caused by the foreign state. "Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if 'satisfactory to the Court.'" *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011); 28 U.S.C. § 1608(e).

"To obtain damages in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were reasonably certain (i.e. more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages." *Valore*, 700 F. Supp. 2d at 83; *quoting Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005). As demonstrated above, the evidence proves that the commission of acts of extrajudicial killing and Defendants' provision of material support and resources for such killing was reasonably certain to cause injury to plaintiff. Therefore, the court must consider what constitutes "reasonable" economic, pain-and-suffering, and solatium damages." *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 257 (D.D.C. 2014).

"This Court and others have frequently addressed the Intentional Infliction of Emotional Distress ("IIED") theory following the enactment of § 1605A." *Goldberg-Botvin v. Islamic Republic of Iran,* 938 F. Supp. 2d 1, 9 (D.D.C. 2013); *Fain v. Islamic Republic of Iran,* 856 F.Supp.2d 109, 123 (D.D.C.2012). Relying principally on the Restatement, courts have set forth the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 26 (D.D.C.2009) (citing Restatement (Second) of Torts § 46(1)). "Survivors are entitled to recover for the pain and suffering caused by the bombings: acts of

terrorism ‘by their very definition’ amount to extreme and outrageous conduct and are thus compensable by analogy under the tort of “intentional infliction of emotional distress.’” *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 89 (D.D.C. 2014); *Valore*, 700 F.Supp.2d at 77 (citing Restatement (Second) of Torts § 46(1) (1965)); *see also Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.Supp.2d 48, 74 (D.D.C.2011) (permitting plaintiffs injured in state-sponsored terrorist bombings to recover for personal injuries, including pain and suffering, under tort of “intentional infliction of emotional distress”); *Estate of Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150, 153 (D.D.C.2011) (same).

Damages under 1605A(c) “may include economic damages, solatium, pain and suffering, and punitive damages.” 28 U.S.C. § 1605(c)(4). “Accordingly, those who survived the attack can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries;…family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages.” *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

“There is no systematic method for assigning a value to the amount of “harm” suffered by a victim of state-sponsored terrorism.” *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010). “It is undeniably difficult to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved.” *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009)(internal quotation omitted). “Damages cannot fully compensate these innocent people, who have suffered so much. But they can offer a helping hand. That is the very least that plaintiffs are owed – and that is what this Court seeks to accomplish.” *Owens*, 71 F. Supp. 3d at 262.

In awarding damages to surviving victims of terrorist attacks, "courts typically award a lump sum, and in so doing, articulate several factors as relevant: the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (D.D.C. 2009); *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012). Courts in this District have developed a framework granting a baseline award of $5 million to surviving victims suffering physical injuries such as fractures, severe flesh wounds and wounds and scars from shrapnel and "lasting and severe psychological pain." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 84. "A lack of physical injury suffered by a victim of state-sponsored terrorism generally counsels in favor of department downward from the baseline award for pain and suffering. *Valencia*, 774 F. Supp. 2d at 17 (awarding $3 million to a victim that did not suffer any physical injury from the attack).

**A. Plaintiff May Also Be Awarded Damages for the Emotional Distress Caused By Witnessing the Murder of Her Son**

Solatium under the FSIA is a measure of compensatory damages that seeks "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort."[14] *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 2d 286, 290 (D.D.C. 2015); *Roth*, 78 F.Supp.3d 379, 402, 2015 WL 349208 at *15. Only immediate family members – parents, siblings, spouses, and children – are entitled to solatium awards. *Owens*, 71 F. Supp. 3d at 260. "Courts may presume that those in direct lineal relationships with victims of

[14] Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED. *Spencer v. Islamic Republic of Iran*, No. 12–CIV–42, 71 F.Supp.3d 23, 26–27, 2014 WL 5141429, at *2 (D.D.C. Oct. 14, 2014) (citing *Valore*, 700 F.Supp.2d at 85).

terrorism suffer compensable mental anguish[,] ... and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages" for siblings. *Id.*

"Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Belkin v. Islamic Republic of Iran*, 667 F.Supp.2d 8, 22 (D.D.C.2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C.2002)).

For the pain and suffering of relatives, damages "must be determined by the nature of the relationship and the severity and duration of the pain suffered by the family member." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d, at 55. The standard award to parents of deceased victims is $5 million. *Id. Owens v. Republic of Sudan*, 71 F. Supp. 3d at 260; *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 52 (D.D.C.2007). Furthermore, an upward department may be required where evidence establishes an especially close relationship between the plaintiff and decedent or the circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing. *Valencia*, 774 F. Supp. 2d at 15.

Plaintiff has suffered tremendously as a result of not only being a victim of a terrorist attack but also witnessing the death of her five month old son. Unlike the majority of family members who have recovered under the FSIA, Batsheva witnessed first-hand the horrific injury and death caused to Yehuda in the attack. Batsheva was forced to perform CPR on her first born child and then watch him die over the course of a six day hospitalization. The evidence demonstrates that Batsheva has, and continues to suffer from severe emotional distress as a result of the attack. Due to the circumstances, Plaintiff requests a total award of $10 million for her pain and suffering and emotional distress.

**B. Plaintiff Is Entitled to Prejudgment Interest**

Plaintiff is entitled to prejudgment interest on awards for pain and suffering and solatium. *Owens*, 71 F. Supp. 3d at 261. "Denying prejudgment interest on these damages would allow defendants to profit from their use of these funds" over the intervening thirteen years. *Id*. at 261 (awarding prejudgment interest on plaintiffs' pain-and-suffering and solatium awards in order to "place plaintiffs in the same position they would have been had they received (and invested) their damages awards at the time of the attack).

An award of prejudgment interest should be calculated "at the prime rate for each year between the accident and the entry of judgment." *Id*. at 262; *Forman v. Korea Air Lines Co.*, 84 F. 3d 446, 450-51 (D.C. Cir. 1996).[15] "Calculating interest based on the prime rate for each year is a simple matter." *Id*. at 262.

The Federal Reserve's data for the average annual prime rate in each year between 2001 and 2015 include:

| | |
|---|---|
| 2002 | 4.67 |
| 2003 | 4.12 |
| 2004 | 4.34 |
| 2005 | 6.19 |
| 2006 | 7.96 |
| 2007 | 8.05 |
| 2008 | 5.09 |
| 2009 | 3.25 |
| 2010 | 3.25 |
| 2011 | 3.25 |
| 2012 | 3.25 |
| 2013 | 3.25 |
| 2014 | 3.25 |
| 2015 | 3.26 |

*See* Bd of Governors of the Fed. Reserve Sys. Historical Data, available at

[15] The prime rate is "the rate banks charge for short-term unsecured loans to creditworthy customers." *Owens*, 71 F. Supp. at 262; *citing Forman v. Korea Air Lines Co.*, 84 F. 3d 446, 450-51 (D.C. Cir. 1996).

http://www.federalreserve.gov/releases/h15/data.htm. In using the framework established by this Court in *Owens*, the prime rate for each year results in a multiplier 1.77 for damages incurred in 2001.

**A. Plaintiff is Entitled to Punitive Damages**

"Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Bodoff v. Islamic Republic of Iran*, 907 F.Supp.2d 93, 105 (D.D.C.2012); *quoting Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 56 (D.D.C.2012)). The determination as to the proper amount of punitive damages to award to a plaintiff is based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290-91 (D.D.C. 2015).

Courts in this District have consistently awarded punitive damages against the Iranian Defendants for providing material support and resources to terrorist organizations. In awarding punitive damages, this Court has found that "defendants' material support for [] terrorist activities is truly awful and worthy of gravest condemnation." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 406 (D.D.C. 2015). The harm caused by defendants' is among the worst imaginable – a terrorist attack aimed at students that shattered the lives of the entire Shoham family.

This Court has previously explained that the particularly malicious and evil nature of state-sponsored terrorism obviates the need for strict attention to the punitive-to-compensatory ratio that recent Supreme Court guidance might otherwise require. *Beer v. Islamic Republic of*

*Iran,* 789 F. Supp. 2d 14, 25 (D.D.C. 2011). Accordingly, this Court frequently awards punitive damages against Iran in the amount of $300 million for providing material support to terrorist organizations. *Id*; *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012)(awarding $300 million in punitive damages); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012)(same).

Plaintiff is entitled to an award of punitive damages in the amount of $300 million. The Court has never before awarded punitive damages in a case arising out of this incident and, therefore, there is no need to reduce the level of punitive damages in light of prior awards. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d at 406.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendants Islamic Republic of Iran and Bank Saderat are liable for the injuries to Batsheva Shoham. "Damages cannot fully compensate these innocent people, who have suffered so much. But they can offer a helping hand. That is the very least that plaintiffs are owed – and that is what this Court seeks to accomplish." *Owens*, 71 F. Supp. 3d at 262. Accordingly, the Court grants plaintiff's motion for default judgment and enters judgment for plaintiff in the amounts specified above.

Respectfully submitted,

/s/ Michael J. Miller
Michael J. Miller, Esq.
D.C. Bar No. 397689
David J. Dickens, Esq.
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224

/s/ Gavriel Mairone
Gavriel Mairone, Esq.
Bena Ochs, Esq.
980 North Michigan Avenue, Suite 1400
Chicago, Illinois 60611
Tel: (312) 253-7444

*Attorneys for Plaintiff*