## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BATSHEVA SHOHAM,** | ) | |
| **Individually and as Administrator** | ) | |
| **to the Estate of Yehuda Shoham** | ) | |
|  | ) | |
| **Plaintiff,** | ) | |
|  | ) | |
| **v.** | ) | **Civil No. 12-cv-508 (RCL)** |
|  | ) | |
| **ISLAMIC REPUBLIC OF IRAN, _et al._,** | ) | |
|  | ) | |
| **Defendants.** | ) | |
|  | ) | |

## MEMORANDUM OPINION

Plaintiff brings claims pursuant to the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran and Bank Saderat. She seeks damages for injuries suffered as a result of a rock-throwing attack committed against her family as they were driving outside an Israeli village in the West Bank on June 5, 2001. Defendants did not appear, and the Clerk filed entries of default as to Iran on September 16, 2013 [ECF No. 47] and as to Bank Saderat on April 9, 2015 [ECF No. 65]. This Court held a two-day evidentiary hearing on plaintiff's motion for default judgment against Iran and Bank Saderat [ECF Nos. 78 & 79]. For the reasons discussed below, the Court concludes that plaintiff's motion must be **DENIED**.

## I. PROCEDURAL HISTORY

Plaintiff filed her complaint on April 2, 2012, pleading causes of action against the Islamic Republic of Iran and Bank Saderat as an agency and instrumentality of Iran. Compl., ECF No. 3.[1]

---

[1] Plaintiff's complaint also plead causes of action against other agencies and instrumentalities of Iran, including Iran Airlines, as well as causes of action against the Syrian Arab Republic and its agencies and instrumentalities. Claims against most of these defendants were voluntarily dismissed. _See_ ECF Nos. 16, 38, 66, 72, & 87. The sole remaining

Their causes of action and the jurisdiction of this Court are premised on section 1605A of the FSIA.

On February 13, 2013, this Court ordered service on Iran via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). ECF No. 25. On March 18, 2013, plaintiff received confirmation through the Court that, with the assistance of the Foreign Interest Section of the Embassy of Switzerland in Tehran, copies of the Summons and Complaint in both English and Farsi were delivered under cover of diplomatic note number 1036-IE on April 21, 2013 to the Iranian Ministry of Foreign Affairs. ECF No. 40. Iran's answer was due on June 20, 2013, which is sixty days after service. 28 U.S.C. § 1608(d). Iran made no response and has yet to appear in this case. The Clerk of the Court entered default against Iran on September 16, 2013. ECF No. 47.

On May 19, 2014, this Court authorized substitute service on Bank Saderat by dispatching copies of the Summons and Complaint in both English and Farsi to defendant via courier service. ECF No. 53. The Clerk sent the required documents by Federal Express, International Service to an address authorized by the Court. The documents were delivered on August 8, 2014, signed for by a receptionist at Bank Saderat's office in Paris, France. ECF No. 62. Bank Saderat's answer was due on October 7, 2014. This Court previously found service on Bank Saderat sufficient and ordered entry of default against Bank Saderat. ECF No. 64. The Clerk of Court entered default against Bank Saderat on April 9, 2015. ECF No. 65.

Following the voluntary dismissal of other defendants, this Court held two days of evidentiary hearings on April 7-8, 2016. At the conclusion of those hearings, plaintiff orally

---

defendants are the Islamic Republic of Iran and Bank Saderat. All references to "defendants" in this opinion refer only to Iran and Bank Saderat.

moved for the Court to enter a judgment of liability against Iran and award damages.[2] The Court

ordered plaintiff to submit proposed findings of fact and conclusions of law to assist in reviewing

the evidence submitted. Plaintiff initially failed to provide the proposed findings and conclusions,

and this Court ordered the case dismissed subject to reinstatement upon motion accompanied by

the proposed findings and conclusions. ECF No. 84.

On October 4, 2016, plaintiff moved to reopen the case and submitted their proposed

findings of fact and conclusions of law. ECF No. 85. This Court granted the motion, ECF No.

88, and now considers whether default judgment should be entered against Iran and Bank Saderat.

## II. FINDINGS OF FACT

Before determining whether defendants should have a default judgment entered against

them, the Court must consider evidence and make findings of fact with respect to plaintiff's

allegations. Section 1608(e) of the FSIA requires that no default judgment shall be entered against

a foreign state or its political subdivision except upon "evidence satisfactory to the court." 28

U.S.C. § 1608(e). The Court, therefore, may not "simply accept a complaint's unsupported

allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

Courts may, however, rely on "uncontroverted factual allegations" that are supported by

"documentary and affidavit evidence." *Id.* (quoting *Valore v. Islamic Republic of Iran*, 700 F.

Supp. 2d 52, 59 (D.D.C. 2010)). Also, in addition to plaintiff's own evidence, courts may take

judicial notice of prior related proceedings and the evidentiary records in cases before the same

court. *Id.*

---

[2] Curiously, plaintiff's oral motion did not include an explicit request as to the liability of Bank Saderat. However, Bank Saderat was alleged as an agency or instrumentality of Iran, and in the context of the hearing it is clear to this Court that plaintiff's request included a finding of liability and damages against *both* Iran and Bank Saderat. Accordingly, plaintiff's oral motion is construed as a motion for default judgment against both remaining defendants.

Here, plaintiff presents a case of first impression regarding Iranian liability for a rock-throwing attack outside an Israeli village in the West Bank during the Second Intifada. Specifically, plaintiff asserts that Iran materially supported Hezbollah and Fatah, who conducted the attack. While this Court is aware of no other cases in which Iran has been found liable for an attack by Fatah, plaintiff relies in part upon evidence presented in previous litigation. Therefore, the Court will assess the basis for accepting this evidence before setting out the findings of fact.

## A. Judicial Notice of Prior, Related FSIA Cases

A court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 2d 379, 387, (D.D.C. 2014); *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938). This is in keeping with Federal Rule of Evidence 201(b), which allows a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In light of this authority and the numerous FSIA cases in recent years giving rise to nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state sponsored terrorism exception to foreign sovereign immunity. *See, e.g.*, *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing cases).

The Court may not simply adopt previous factual findings without scrutiny however. This is because factual findings "represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events." *Id.* at 116. As such, courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules. *Rimkus*, 750 F. Supp. 2d at 172. This does not mean, however, that courts in later, related FSIA proceedings are given the

"onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack."
*Id.* Instead, courts adjudicating related FSIA cases may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.* The records of this Court in related proceedings are not subject to reasonable dispute. *Roth*, 78 F. Supp. 3d. at 387. Thus, the type and substance of evidence previously presented to this Court in prior proceedings may be judicially noticed in the process of reaching findings of fact in this case.

Plaintiff alleges that Iran and Bank Saderat have materially supported Hezbollah and Fatah, which led to the June 5, 2001 attack. The Court shall take judicial notice of the evidentiary record in previous cases litigated before this Court, specifically *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 46 (D.D.C. 2003) (*Peterson I*), *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (*Peterson II*), and *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010), in which this Court received overwhelming evidence demonstrating the material and technical support from Iran to Hezbollah in coordinating and conducting terrorist attacks. The Court adopts the findings in those cases that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran, and that Iran is liable for its state sponsorship of terrorism.

### B. The Attack

On the evening of June 5, 2001, Binyamin Shoham was driving with his wife, Batsheva Shoham, and his infant son, Yehuda Shoham, along the main road from Jerusalem to Nablus in the West Bank. Testimony of Binyamin Shoham 142:25-143:7, ECF No. 77. The Shohams lived in Shilo, a town located between Jerusalem and Nablus in the West Bank. Binyamin Testimony at 133:18, 140:10-15. They were traveling home after a visit with Binyamin's parents, who lived in

about an hour away in Ra'anana, a city north of Tel Aviv. Batsheva was seated in the back seat behind Binyamin, and Yehuda was in the middle seat in a rear-facing car seat. *Id.* at 144:15-21. As the car travelled outside the village of Shilo, Binyamin noticed something flying in the air toward the car. *Id.* at 144:23-145:8. A rock or boulder the size of a small watermelon crashed through the front windshield, passing through the two seats and striking Yehuda in the head. *Id.* at 145:15-22. Binyamin stopped the car and discovered that Yehuda was not breathing. *Id.* at 144:23-145:12. Batsheva performed CPR while Binyamin called for an ambulance. *Id.* at 147:20-148:7. Yehuda began breathing again but was bleeding from injuries on his head. *Id.* After the ambulance arrived, Yehuda was taken to the hospital. *Id.* at 148:24-149:2. Yehuda was in the hospital for six days before he passed away due to his injuries. *Id.* 152:11-13, 154:14-23.

Days later, an Israeli investigator named A'Atef Aweeda[3] interrogated a suspect named Wahid or Muayad Kafina.[4] Pl.'s Exhibit 1, Aweeda Deposition 11:4-23, 15:9-15. Kafina confessed that he and others—Mahmud Ibrahim Khatib, Muhamad Bik, and Sakar Saleh (or Zalach or Shahin)[5]—were throwing rocks at Israeli vehicles on the night of June 5, 2001 near the town of As-Sawiya, which is just north of Shilo. *Id.* at 16:18-17:3. While Kafina's original statement only listed Khatib and Bik, Kafina amended his statement to include that Sakar had been present and that Sakar had fired an improvised pistol at cars as they drove by. Pl.'s Exhibit 7, June

---

[3] Senior Master Sergeant A'Atef Aweeda is deputy commander of the Israeli police terrorism investigation unit in Judea and Samaria. He began as a patrol officer in 1994, and he began conducting investigations in 1997. He began investigating for the terrorism unit in 1999. At the time of the attack on Yehuda Shoham, Aweeda worked as an investigator for terror incidents in his district. He mostly investigated Palestinian attacks on Israelis.

[4] The interrogation was conducted in Arabic, and the accompanying statements were transcribed in Arabic and then translated to Hebrew. Those statements were again translated to English for this Court. An apparent result of the translations is the existence of multiple spellings for names and places. For instance, the suspect's name appears in the transcript of Aweeda's deposition as "Muayad Kafina" and "Wahid Kafina." However, the translations of Kafina's statements to police use the name and spelling "Muayad Kafina."

[5] Again, the exhibits refer to a "Sakar Shahin," "Sakr Shahin," "Safey," "Saker," and "Sakar Zalach." The Court understands that these names and spellings all refer to the same person, an associate or friend of Muayid Kafina. The Court will refer to him throughout as Sakar Saleh.

25, 2001 Recorded Statement to Police by Muayad Kafina. Sakar Saleh himself also admitted to throwing rocks at cars with Khatib, Bik, and Kafina on the night of June 5, 2001. Pl.'s Exhibit 4, Police Report, June 22, 2001 Recorded Statement to Police by Sakar Saleh. Kafina stated that they each threw at least two stones and that two cars were hit, but Kafina did not know who was in the car or whether they had been injured. June 17 Kafina Statement. He learned on the news the next day that a child had been injured in the area where they had been stoning cars. *Id.* Kafina later added details that Sakar "took an improvised pistol with him and fired from that pistol at three Israeli vehicles that passed by," but he did not know if any of the vehicles had been hit. June 25 Kafina Statement. There is no evidence that the Shoham's vehicle had been shot at or hit by bullets.

Muayid Kafina admitted to being a member of Tanzim Fatah, recruited by a man named Jamal Abdullah Hatid (or Khatib) a year and a half earlier. *Id.* at 18:19-19:5; Pl.'s Exhibit 3, June 17, 2001 Recorded Statement to Police by Muayad Kafina. When asked why he decided to throw stones at Israeli vehicles, Kafina responded "because of the security situation prevailing in the area." *Id.* at 18:1-3; June 17 Kafina Statement. Additionally, Kafina and Sakar Saleh both stated that they previously had rocks thrown at them while traveling to Ramallah, and that afterwards they were meeting in a mosque and decided to throw stones at Israeli vehicles passing near their village. June 17 Kafina Statement; June 22 Sakar Statement. Kafina stated that he "had no other activity" while he was a member of Fatah Tanzim. June 17 Kafina Statement. However, Kafina later admitted to being with Sakar Saleh on five or six separate occasions when Sakar fired bullets at Israeli vehicles as they passed by. June 25 Kafina Statement. It is unclear whether Sakar Saleh was a member of any organization, and there appears to be no confession by any of the others as to their membership, if any, to Fatah Tanzim or any other organization.

According to Aweeda, there were several rock attacks involving Fatah Tanzim during the Second Intifada. Aweeda Aff. 32-33. Many of these incidents occurred in As-Sawiya, where Kafina admitted to throwing stones. *Id.* Aweeda testified that the modus operandi is to stand on the side of the road and throw rocks at Israeli cars. *Id.* Kafina and the others were able to identify Israeli vehicles by the color of the license plates: Israeli license plates were yellow while non-Israeli (Palestinian) plates were white. *Id.* at 19:20-20:2; June 17 Kafina Statement.

### C. Tanzim – Fatah – Al-Aqsa Martyrs Brigade

Fatah, also known as the Palestinian National Liberation Movement, was established in 1959 by Yasser Arafat.[6] Testimony of Dr. Ido Zelkovitz 38:16-25.[7] Fatah called for an armed struggle against Israel. *Id.* at 43:25-44:1. In 1965, Fatah began attacking Israeli targets. *Id.* at 39:6-13. In 1967, following the Six Days War, Fatah coordinated with the PLO. *Id.* at 44:12-25. In 1969, Arafat took over as Chairman of the PLO, and Fatah has been the "backbone" of the PLO since. *Id.*

Fatah is affiliated with various militant groups, including the Tanzim and the al-Aqsa Martyrs Brigade (AAMB). *Id.* at 26:9-17. Tanzim is described by the State Department as "small and loosely organized cells of militants drawn from the street-level membership of Fatah." *Patterns of Global Terrorism* 2001 at 54. Tanzim was made up of cells of Fatah-affiliated operatives organized to carry out attacks for the Fatah organization. *Id.*; Pl.'s Exhibit 32, IDF Military Intelligence Report, May 3, 2002. Some Tanzim militants are also active in the sub-group

---

[6] Arafat also was Chairman of the Palestinian Liberation Organization (PLO) and President of the Palestinian National Authority (PA). He served as the movement's chairman and president of the PA until his death in 2004.

[7] Dr. Zelkovitz is a Senior Lecturer and Head of Middle East Studies at Emek Yezreel Academic College, a researcher at the University of Haifa in Israel, and a Policy Fellow at Mitvim, the Israeli Institute for Regional Foreign Policies. He has BA, Master's, and Ph.D. degrees from the University of Haifa in Middle Eastern Studies, focusing specifically on Islam, Hamas, the Fatah Movement, and the politics of Palestinian universities. The Court shall treat Dr. Zelkovitz as an expert on the history of the Fatah Movement.

AAMB, which has claimed responsibility for shootings and bombings in the West Bank against settlers and Israeli soldiers. *Id.* AAMB is designated as a foreign terrorist organization (FTO) by the United States Secretary of State. However, while all AAMB members are Tanzim, not all Tanzim are AAMB members. Similarly, all Tanzim or AAMB members are Fatah, but not all Fatah members are Tanzim or AAMB. Tanzim and AAMB are militia and non-institutionalized factions of Fatah. Pl.'s Exhibit 28, Zelkovitz Aff. 13. According to IDF intelligence, however, while Arafat had attempted to distance Fatah from AAMB, the Fatah movement and the AAMB "are one and the same." Ex. 32, IDF Report 2.

Palestinian resistance in Israel surged in September 2000. This is commonly referred to as the Second Intifada.[8] Fatah military operations in the West Bank and Gaza Strip have been largely attributed to AAMB. *Id.* During the relevant period in this case, a man named Marwan Barghouti acted as the commander of Tanzim and AAMB in the West Bank. *Id.* Barghouti funneled money to field squads of AAMB for the purpose of purchasing weapons and support AAMB members' livelihood. Zelkovitz Aff. 12, 21. In 2004, Barghouti was convicted and sentenced by an Israeli court to five life sentences for causing the deaths of five Israelis in terrorist attacks attributed to Tanzim and AAMB. *Id.* He sponsored many attacks, directly launched others, and gave money with direct orders to Fatah Tanzim activists. Zelkovitz Testimony 64:19-25.

In short, Fatah Tanzim and AAMB actively promoted, funded, and participated in terrorist attacks against Israelis in the West Bank during the Second Intifada. According to testimony by Inspector Aweeda and Dr. Zelkovitz, this included rock-throwing attacks at Israeli cars in the West Bank near where the Shohams were attacked and Yehuda Shoham was killed.

---

[8] The Second Intifada began on September 28, 2000 and continued until the end of 2004. Zelkovitz Testimony 51:3-18.

### D. Iran/Hezbollah Connections to Fatah Tanzim and AAMB

Iran is considered by the United States to be one of the most *dangerous* state sponsors of terrorism in the world, and has been designated by the United States Secretary of State as a state sponsor of terrorism since January 19, 1984. Further, the State Department has broadly concluded that Iran is one of the most *active* state sponsors of terrorism in the world, providing planning and support to a multitude of militant terrorist groups. *Patters of Global Terrorism* at 64. Specifically, following the outbreak of the Second Intifada, Iranian support for Palestinian groups using violence against Israelis "intensified." *Id.*

While Iranian support of Fatah has ebbed and flowed since the 1970's, the outbreak of the Second Intifada brought increased Iranian support. Zelkovitz Aff. 16; Zelkovitz Testimony 49:3-50:14; Pl.'s Exhibit 33.[9] Iran specifically called for cooperation with Fatah Tanzim. In an October 20, 2000 statement on Iranian television, Iran's supreme leader Ali Khamenei announced:

> We regard Palestinians as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people . . . The Palestinian people must continue the blessed Jihad and its standing against the enemies of Islam . . . The Hamas, Islamic Jihad **and Fatah forces** must continue the struggle in a united way . . . But, indeed, the only solution [to the crisis in the region] is the elimination of the root of this crisis, which is the Zionist regime imposed on the region.

Pl.'s Exhibit 33 (emphasis added).

The State Department ultimately concluded that Iran provided "Palestinian rejectionist groups" with "varying amounts of funding, safehaven, training, and weapons," prior to and during

---

[9] The relationship between Fatah and Iran dates back to the 1970's when Fatah had an infrastructure in Sidon, Lebanon. When Khomeini opposed the Shah, he sent fighters to train in the Fatah camps in Lebanon. Fighters who took part in this training later helped establish the Islamic Revolutionary Guard and Hezbollah. In 1974, when Khomeini became supreme leader of Iran, he issued a fatwa that the Fatah struggle against Israel be considered a holy war and that all Muslims must take part in the struggle. Zelkovitz Testimony 39-40; Zelkovitz Aff. 7-8. Arafat was the first Arab leader to visit with Khomeini after the 1979 revolution, and Khomeini proclaimed an al-Quds day designed to bring together Shi'ite and Sunni Muslims in calling for the destruction of Israel. *Id.* 40-42.

2001. *Patterns of Global Terrorism* at 65. It has also concluded that Iran "encouraged Hizballah and the rejectionist Palestinian groups to coordinate their planning and to escalate their activities." *Id.* These previous findings, coupled with Dr. Zelkovitz's testimony, supports the conclusion that Iran also supported Fatah and AAMB by providing money, weapons, guidance, and recruitment assistance. Zelkovtiz Aff. 20.

Dr. Zelkovitz testified that Hezbollah provided money and support to Fatah Tanzim at the direction of the Iranian government. *Id.* at 16-20; Zelkovitz Testimony 70:16-24. During the Second Intifada, Iran provided Fatah with millions of dollars' worth of money and weapons. Zelkovitz Testimony 62:1-10. For example, in January 2001 Israel intercepted a ship carrying arms directly from Iran to the PA, as well as two other arms shipments in 2001 and 2002. *Id.* at 60-61. The ship contained anti-tank launchers, anti-aircraft missiles, grenades, and other weapons. *Id.* Interrogation of the crew indicated that Iran was directly involved in supplying those arms to the PA. Zelkovitz Aff. 19-20; Zelkovitz Testimony 60. Fuad Shubaki, Arafat's financial advisor, was convicted by an IDF court of purchasing and transferring weapons from Hezbollah to the PA. *Id.*

Dr. Zelkovitz also provided an example of an AAMB cell "operated mutually by Fatah and Hezbollah under the command of Ghalib Awalli, a senior member of Hezbollah who served as a contact between the two organizations (Fatah and Hezbollah)." Zelkovitz Aff. 20. Further, some Fatah militants have claimed responsibility for attacks carried out in the name of "al-Aqsa Martyr Brigades Hezbollah Palestine," an apparent amalgamation of the names of overarching organizations. Zelkovitz Aff. 18. Coupled with the findings of Israeli intelligence, the evidence supports the conclusion that Iran and Hezbollah provided organizational support to Fatah Tanzim and AAMB.

Dr. Zelkovitz also testified that Fatah provides payments to terrorists through official Fatah sources like Munir Mikdah, a general within the Fatah organization who developed channels of money to Fatah/AAMB militants in Jenin and Nablus. Zelkovitz Testimony 35:2-14. Mikdah had no finances of his own, and the funds used to sustain attacks in the West Bank came directly from Iran. Exhibit 33, ¶; Zelkovitz Testimony 59:13-25. In fact, Mikdah himself stated in interviews and other public statements that he received money from Iran or Hezbollah before channeling it to Fatah/AAMB militants. *Id.* at 35:17-36:10. In one example, a Fatah Tanzim member serving as treasurer for AAMB provided information to Israeli police that he had received $30,000 from Mikdah and transferred these funds to ten Fatah Tanzim/AAMB operatives. Another Fatah Tanzim/AAMB member named Mahmud Aweiss admitted at his trial that he was a member of AAMB and has received $50,000 from Mikdah. Zelkovitz Aff. 22-23. Both of these militants were from the Nablus and Jenin area, the same region as Kafina's village: As-Sawiya. *Id.* In fact, Nablus and Jenin were among the main areas that received funds from Hezbollah and Iran. *Id.* Such evidence supports the conclusion that Iran and Hezbollah provided financial support to Fatah Tanzim and AAMB.

Iran also maintained a "Martyrs Foundation" intended to compensate the families of militants who were killed during operations against Israel. Zelkovitz Testimony 66:8-67:24. Zelkovitz Aff. 27. This compensation served essentially as a bounty on Israelis, encouraging militants to create relationships with Hezbollah and Iran and to create as much damage as possible so that their families would be taken care of. *Id.* On occasion, AAMB members have been sent to Tehran for medical treatment in exchange for providing recruitment services or developing additional cells in the West Bank. Zelkovitz Testimony 67:11-20. Such evidence supports the

conclusion that support for Fatah Tanzim and AAMB was given in exchange for acts of violence against Israelis and the state of Israel.

In sum, the Court has been presented with evidence that Iran and Hezbollah have generally supported Fatah Tanzim and AAMB in hostilities against Israel and Israelis, and that Fatah Tanzim and AAMB relied on the money and support from Iran to conduct those hostilities. Such hostility—and material support to Fatah Tanzim and AAMB in furtherance thereof—appears to have been, in effect, the official state policy of Iran at the time of the June 5, 2001 attack on the Shohams.

### E. al-Manar Television

Another method of Iran/Hezbollah's incitement and encouragement of attacks against Israelis during the Second Intifada was through television programming on al-Manar, a television station broadcast throughout the Palestinian territories. Testimony of Avi Jorisch 85:20-86:7, 112:11-15.[10] Mr. Jorisch testified that Iran materially financed al-Manar, which was owned and operated by Hezbollah. *Id.* He also testified that the purpose of al-Manar was to "act as a mouthpiece for Hezbollah and for Iran" and to incite violence against Israelis. Jorisch Testimony 102:18-103:5, 104:3-8. Specifically, the broadcasts included incendiary language and imagery including chants of "Death to Israel," images of Jerusalem, the word "resistance," maps of Palestine, images of Hezbollah or rebels marching, and—perhaps most relevant—references to throwing Jews into the sea and engaging in rock-throwing "because it's cheap and you can find

---

[10] Avi Jorisch is a Senior Fellow for Counterterrorism at the American Foreign Policy Council in Washington, DC, and a member of the Council on Foreign Relations and of the Advisory Board to United Against a Nuclear Iran. He previously served as a Policy Advisor to the United States Department of Treasury's Office of Terrorism and Financial Intelligence and a former consultant for the Department of Defense and Department of Homeland Security on issues related to terrorist financing and radical Arab media. He has a Master's in Middle Eastern Studies from the Hebrew University of Jerusalem and studied Arabic and Islamic history at the American University in Cairo and al-Azhar University, prestigious centers of Islamic learning in Egypt. The Court shall treat Mr. Jorisch as an expert on Iran/Hezbollah's link to al-Manar finances and programming.

[rocks] anywhere." *Id.* at 117:12-120:7. According to Jorisch, Iran encourages Palestinians to engage in rock-throwing as an effective means of resistance against Israel. *Id.* at 117:10-21. Station officials have also helped organize attacks and broadcast the locations of demonstrations. *Id.* at 107:12-23.

The programming of al-Manar became much more violent in response to the Second Intifada and quickly became the most watched station in the Arab world. *Id.* at 111:12-112:25. Jorisch testified that, despite being relatively unknown among Americans and Israelis, al-Manar had 14 satellite providers broadcasting to 25 million viewers in the Arab world. *Id.* at 101:5-11. Leadership of organizations, including Fatah Tanzim, have appeared on al-Manar to spread information to members and incite their supporters, as well as to claim responsibility for attacks and advertise where demonstrations would take place. *Id.* at 107:19-23, 115:6-116:20. As noted, the broadcasts included videos of rock-throwing. *Id.* at 117:9-21, 128. These broadcasts reached several Palestinian territories, including the area where the June 5, 2001 attack on Yehuda Shoham occurred. *Id.* at 112:10-14. Further, Fatah Tanzim used al-Manar to broadcast its attacks to a large Palestinian audience in the West Bank. *Id.* at 122-123.

In sum, the evidence supports the conclusion that Iran used al-Manar to incite and encourage attacks against Israelis during the Second Intifada, and incitement of such attacks appears to have been, in effect, the official state policy of Iran at the time of the June 5, 2001 attack on the Shohams.

### F. Bank Saderat

Bank Saderat was established in 1952 and became a commercial state-owned bank of Iran in 1979 after the revolutionary government nationalized the bank. Jorisch Aff. ¶ 12.[11] On October

---

[11] Plaintiffs apparently did not submit Mr. Jorsich's affidavit into evidence at the original hearing, and instead submitted it to the Court's dockets following the motion to reopen the case. ECF No. 86. The Court granted the

25, 2007, the United States Treasury Department designated Bank Saderat as a specially Designated Global Terrorist, as well as an affiliate of the Iranian Revolutionary Guards Corps and an Iran-linked financial institution, pursuant to Executive Order 13,224. Jorisch Aff. ¶ 13. The Treasury Department specifically referenced Bank Saderat's provision of financial services to Hezbollah and other terrorist organizations as the reasoning for the designation. *Id.*

Iran would transfer hundreds of millions of dollars to various terrorist groups each year, including approximately $200 million to Hezbollah each year. Pl.'s Exhibit 28; Zelkovitz Aff. at 16. After the start of the Second Intifada, Iran provided Hezbollah over $50 million, and these funds were likely distributed in part through accounts at Bank Saderat. Zelkovitz Testimony at 62:7-10. Hezbollah used these funds, in part, to fund Mikdah and Fatah Tanzim's terrorist activities in the West Bank. *Id.* at 62:11-22.

In 2009, Iran announced a program to privatize Bank Saderat, but that process has been a sham because the bank is still controlled by the government. Zorisch Aff. ¶ 16. In 2010, the U.S. Treasury Department identified 21 entities in Iran's banking, insurance, and engineering industries that were determined to be owned or controlled by the Iranian government. Zorisch Aff. ¶ 14. Bank Saderat was listed among these entities, along with the following statement by the U.S. Treasury Department Office of Foreign Asset Control (OFAC):

> In 2006, OFAC identified . . . Bank Saderat Iran as [a] financial institution[] owned or controlled by the Government of Iran. Furthermore, Bank Saderat Iran was designated on October 25, 2007 pursuant to Executive Order 13224 for its support of terrorism-related activities.

---

motion to reopen the case but did not expressly accept the affidavit into evidence. The Court will do so now. The affidavit is admitted into evidence as of October 4, 2016.

*Id.*; Press Release, U.S. Treasury, Treasury Identifies 21 Entities Determined to be Owned or Controlled by the Government of Iran Treasury Exposes Iran's Foreign Trade Network, Identifies Entities operating in Belarus, Germany, Iran, Italy, Japan and Luxembourg (August 3, 2010), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg811.aspx. [12]  As of 2012, 27.7% of the bank shares were owned directly by the Iranian government, 11.66% of the shares were owned by "legal persons" owned or operated by the Iranian government—such as the Iranian Privatization Organization, the Iranian Ministry of Petroleum, or the IRGC—and 40% of the shares were owned by "Provincial Investment Group," a wholly-owned entity of the Iranian government. Jorisch Aff. ¶¶ 19-20.  This means nearly 80% of the shares are owned or controlled directly or indirectly by the Iranian government, or persons affiliated with the government. *Id.* In that same time, Bank Saderat was sanctioned for providing services to terrorism and was designated as an Iran-linked financial institution by the Treasury Department. Jorisch Aff. ¶ 15.

In sum, the evidence supports the conclusion that Bank Saderat is an instrumentality of Iran and was generally used to further the state policy of Iran, including the incitement and support of terrorist attacks in Israel and the West Bank.

### G. Plaintiff's Status and Injuries

Plaintiff brings claims individually and as the administrator of the estate of her deceased son, Yehuda Shoham.  The Court now makes findings regarding the status of plaintiff, including

---

[12] Further, in the 2006 press release, the Treasury Department and Stuart Levy, the Under Secretary for Terrorism and Financial Intelligence, concluded that Bank Saderat "facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year," and that "[t]he bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad." Press Release, U.S. Treasury, Treasury Cuts Iran's Bank Saderat Off From U.S. Financial System (September 8, 2006), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx.  "A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001." *Id.*

the injuries she and Yehuda suffered as a result of the June 5, 2001 attack and their citizenship (as is relevant to their entitlement to recover under section 1605A of the FSIA).

### 1. Batsheva Shoham

Plaintiff Batsheva Shoham was a citizen of the United States at the time of the attack, having been born to two American citizens. Her mother was born in Los Angeles, California and her father was born in Detroit, Michigan. Testimony of Batsheva Shoham 6:8-14, ECF No. 79. However, she was born in Israel and lived there as an adult, living in the United States only "for a few months" when she was five years old. *Id.* at 5:15-24, 6:15-17. Batsheva Shoham was both a witness to and victim of the June 5, 2001 attack against herself, her husband, and her infant son. *Id.* at 18-26. Despite Batsheva's efforts to save Yehuda, which included performing CPR for ten minutes before an ambulance arrived, Yehuda died after six days in the hospital. *Id.* In the moments following Yehuda's death, Batsheva's world "shattered." *Id.* at 28:4-5. By custom, Batsheva mourned for seven days, spending time "on the floor" as friends and neighbors came to comfort her. *Id.* at 28:15-17. She continued to mourn beyond those seven days, and she has not been able to return to a normal life. *Id.* at 11-12. She continues to suffer severe emotional distress from the attack. *Id.* at 28-30, 36:21-37:6. To this day, it is difficult for Batsheva to be around other children, including her own, or to drive her car. *Id.* at 28:8-25, 32:19-33:1, 36:21-37:6. She is in pain all the time and cries periodically, though she does not always know what triggers each episode. *Id.* at 32:13-15, 36:23-37:3. She has sought therapy, along with other members of her family, to deal with the emotional distress caused by Yehuda's death. *Id.* at 32:1-15, 34:10-20. Further, the attack, and the resulting loss of Yehuda, has strained her marriage to Binyamin Shoham and made it difficult for her to communicate with her other children. Binyamin Testimony

161:6-20; Batsheva Testimony 34:14-23. She is unable to visit her son's grave because it is too painful. Batsheva Testimony 34:5-9.

### 2. Estate of Yehuda Shoham

Yehuda Shoham and his father Binyamin Shoham—who were both born in Israel—were not American citizens. Binyamin Testimony 133, 138:1-2.[13] Yehuda was a victim of the June 5, 2001 attack against himself, his mother, and his father. He was struck in the head by a rock and suffered traumatic brain injuries as a result. He stopped breathing at the scene of the attack, but was resuscitated by his mother, Batsheva Shoham, before being transported to the hospital. Binyamin Testimony 148:1-7. When he began breathing again he made only small squeaky noises, but he did not cry. *Id.* His head was cut and bleeding following the attack, and he experienced tremendous swelling in his head and face while at the hospital. Binyamin Testimony 151:22-152:5; Batsheva Testimony 23-24. He was heavily bandaged, largely unresponsive, and the doctors indicated he had likely suffered brain damage. *Id.* He was hospitalized for six days before he died. *Id.* Yehuda is being represented in this litigation by his mother, Batsheva Shoham, who is the administrator of his estate. Compl. 41-45.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The statute codifies the concept of foreign sovereign immunity, something which is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (quoting *Verlinden B.V.*

---

[13] The filings and evidentiary record all indicate that Yehuda was a non-citizen, and did not qualify for birthright citizenship under 8 U.S.C. § 1401.

*v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). The FSIA sets forth exceptions to foreign sovereign immunity that provide the only authority for a district court to assert subject matter jurisdiction over claims against a foreign state. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the district court has no jurisdiction." *Id.*

Because subject matter jurisdiction is premised on the existence of an exception to foreign sovereign immunity, a district court considering a claim against a foreign state must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance to assert an immunity defense." *Verlinden*, 461 U.S. at 493 n. 20. This is in keeping with the general rule that "[s]ubject-matter jurisdiction can never be waived or forfeited;" thus, when jurisdictional questions arise in a suit, "courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).

### 1. Original jurisdiction

Federal district courts have original jurisdiction over FSIA cases by virtue of 28 U.S.C. § 1330. It provides that original jurisdiction will exist over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605 to 1607 of the FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a). Section 1604 of the FSIA reinforces element four, stating that foreign states are presumptively immune from jurisdiction in federal and state courts except to the extent provided in sections 1605 to 1607. 28 U.S.C. § 1604.

All of section 1330(a)'s requirements are met in this case. First, plaintiff has not demanded a jury trial. This is, therefore, a nonjury civil action. Second, this suit is against defendants as legal persons, not against property. Shoham's claims, therefore, seek relief *in personam*. *Cf. Gang*

*Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property.").

Third, this suit is against a "foreign state." One defendant, Iran, is plainly a foreign state. The status of Bank Saderat requires greater consideration. The FSIA defines a foreign state at section 1603(a) as including "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign is any entity that (1) is a separate legal person, corporate or otherwise, (2) is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or ownership interest is owned by a foreign state or political subdivision thereof, and (3) is not a citizen of a State of the United States or created under the laws of any third country. 28 U.S.C. § 1603(b). The D.C. Circuit has adopted a "categorical approach" to determining the legal status of foreign government-related entities for purposes of the FSIA's jurisdiction and service of process provisions: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003). The business of banking is plainly commercial in nature, and Bank Saderat satisfies the elements of § 1603(b): it is a separate legal person, it is an organ of Iran or a majority of its shares are owned by Iran, and it is not a citizen of a State of the United States or created under the laws of a third country. Accordingly, Bank Saderat is an agency or instrumentality of Iran.

### a. Sovereign immunity

The final requirement for jurisdiction under section 1330(a)—that there be an exception to sovereign immunity as to the defendants—requires more substantial explanation. The exception to foreign sovereign immunity relevant to this suit is codified at 28 U.S.C. § 1605A, the state sponsored terrorism exception. That section establishes that a foreign state has no immunity

> [I]n any case . . . [1] in which money damages are sought [2] against
> a foreign state [3] for personal injury or death that was [4] caused
> by [5] an act of torture, extrajudicial killing, aircraft sabotage,
> hostage taking, or the provision of material support or resources for
> such an act if such act or provision of material support or resources
> is engaged in by an official, employee, or agent of such foreign state
> while acting within the scope of his or her office, employment, or
> agency.

28 U.S.C. § 1605A (numbering added). The Court now considers each of these requirements for waiver of sovereign immunity.

First, the complaint identifies and seeks only monetary remedies for plaintiff's injuries. Second, as established above, both defendants are foreign states as defined by the statute. Third, plaintiff has proven various instances of personal injury or death and all claims arise from these instances. Under section 1605A, such injury or death need not be suffered directly by the claimant; instead, it "must merely be the bases of a claim for which money damages are sought." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). Jurisdiction is not restricted to physical injury suffered directly by each claimant. *Id.* Thus, plaintiff's various claims for the physical and emotional injuries to Batsheva Shoham and the economic losses to Yehuda Shoham's estate, all of which spring from the June 5, 2001 attack, constitute the type of claims required for jurisdiction.

The fourth element, causation, is necessary to overcome sovereign immunity and establish subject matter jurisdiction. This jurisdictional causation is distinct from the substantive causation of the underlying cause of action.[14] Jurisdictional causation is established by showing "some

---

[14] The D.C. Circuit has distinguished the issue of jurisdictional causation under the state sponsored terrorism exception from the proof necessary to prevail on the substantive cause of action. Holding that FSIA is "solely a jurisdictional provision," the Circuit confirmed that to succeed in the end "the plaintiff must go beyond jurisdiction and provide proof satisfying the substantive cause of action." *Kilburn*, 376 F.3d at 1129. Regarding jurisdictional causation, the D.C. Circuit rejected the higher but-for standard in favor of a proximate cause standard in part because a higher standard would impose an "additional hurdle" to recovery. *Kilburn*, 376 F.3d at 1128. *See also Rux v. Republic of*

reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Id.* (internal citation omitted). Plaintiff need not show that the injuries would not have occurred "but for" defendants' actions. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (interpreting the similarly worded causation requirement of the former state sponsored terrorism exception to foreign sovereign immunity, section 1605(a)(7), as requiring only "proximate cause"). Rather, plaintiff must simply allege facts sufficient to establish a reasonable connection between the material support to a terrorist organization and the damage arising out of a subsequent attack. *Kilburn,* 376 F.3d at 1130 (finding that the allegations in the complaint were sufficient to establish jurisdictional causation); *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) ("Plaintiffs must establish jurisdictional causation by alleging facts sufficient to establish a reasonable connection between a country's provision of material support to a terrorist organization and the damage arising out of a terrorist attack.").

Plaintiff's allegations satisfy this relaxed standard. Specifically, plaintiff alleges that the June 5, 2001 rock-throwing attack was a terrorist attack perpetuated by Muayid Kafina, a member of Fatah Tanzim, a terrorist organization that received material support and resources from Iran and Bank Saderat by way of Hezbollah and other intermediaries. Further, Shoham alleges that Iran and Bank Saderat have distributed weapons, funding, and organizational support to terrorist organizations in the West Bank, including Fatah Tanzim, and have purposefully encouraged and incited rock-throwing attacks against Israelis through the television station al-Manar. Thus, the facts found by the Court demonstrate that defendants (1) provided substantial support to

---

*Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) ("It [the proximate cause standard] serves simultaneously to weed out the most insubstantial cases without posing too high a hurdle to surmount at a threshold stage of the litigation.").

Hezbollah, Fatah Tanzim, and AAMB through provision of money, weapons, organizational support, and training and (2) encouraged the escalation of terrorist activities, including rock-throwing attacks against Israeli targets. These acts have a reasonable connection to the June 5, 2001 rock-throwing attack that ultimately killed Yehuda Shoham. This is sufficient to pass the relatively low bar of jurisdictional causation imposed by the FSIA.[15]

Finally, plaintiff's claims must arise out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). This act or provision of material support must be engaged in by an officer, employee, or agent of the foreign state within the scope of the actor's office, employment, or agency. *Id.*

In this context, provision of material support or resources has the same meaning as it is given in section 2339A of Title 18 of the U.S. Code. 28 U.S.C. § 1605A(h)(3). That section defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

---

[15] However, plaintiff's allegations lack precision as to defendants' role in planning, organizing, or funding this particular attack, or indeed whether this attack was planned, organized, or funded at all. For example, while plaintiff's evidence clearly evinces a *general* support for terrorist organizations and a *general* encouragement of rock throwing attacks, there is no direct factual connection between Muayid Kafina and defendants Iran or Bank Saderat. Further, the Court is skeptical as to whether the evidence—and the reasonable inferences drawn—is sufficient to establish defendants' liability. In other words, while the allegations here sufficiently demonstrate a "reasonable connection" between defendants' acts and rock throwing attacks in general, they may be insufficient to satisfy the substantive causation requirements of underlying causes of action arising from the specific attack here. However, at the jurisdictional stage, plaintiff has passed her burden. The Court will address the substantive causation issues below.

Extrajudicial killing has the same meaning as it is given in section 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That section defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (excluding from the definition killings that are lawful under international law).

The June 5, 2001 rock-throwing attack caused the death of Yehuda Shoham. Yehuda was not killed according to the judgment of a regularly constituted court affording any judicial guarantees. Rather, Yehuda was killed when a large rock was deliberately and maliciously thrown through the windshield of the car in which he was traveling. Further, the car was likely targeted solely based on the fact that it was carrying Israelis, made apparent by the yellow license plates adorning Israeli vehicles. There is no functional difference between a rock attack targeting civilians and a shooting or suicide bombing targeting civilians; the instrument of death has no bearing on whether the killing was extrajudicial. The June 5, 2001 rock-throwing attack that killed Yehuda Shoham was undoubtedly an "extrajudicial killing" as defined by the FSIA.

As noted, it is well documented that Iran and Bank Saderat have provided material support to Fatah Tanzim or AAMB generally in the form of property, weapons, funding, financial services, lodging, expert advice/assistance, etc. However, whether defendants provided "material support or resources" that caused *this particular act* by their provision of money and training to Hezbollah or Fatah Tanzim or AAMB is a more difficult question because there is no evidence that the specific June 5, 2001 attack was organized, planned, funded, or ordered by Fatah Tanzim or AAMB. Importantly, it is not necessary for material support to have directly contributed to the specific act under which a FSIA claim arises. *See In re Terrorism Litig.*, 659 F. Supp. 2d 31, 42

24

(D.D.C. 2009). However, the material support must have caused an act of extrajudicial killing, or some other enumerated act under § 1605A. It is unclear whether Muayid Kafina perpetrated this attack based on his membership in Fatah, or if he was a mere participant in a group's retaliation for having been stoned by Israeli settlers on a prior occasion. The Court is therefore skeptical as to whether Iran's material support to Fatah Tanzim or AAMB *caused* the extrajudicial killing of Yehuda Shoham.

However, as noted, jurisdictional causation is an easier hurdle to clear than substantive causation. Plaintiff alleges that defendants provided material support for this attack by generally providing money and organizational support to Fatah Tanzim and AAMB, and by providing money and organizational support to al-Manar, and by intentionally encouraging and inciting rock-throwing attacks against Israelis like Yehuda Shoham. The Court finds that defendants have generally provided material support to such organizations, and have encouraged and incited rock-throwing attacks. Further, because Kafina professed to being a member of Fatah Tanzim, the Court finds that the material support provided to those organizations is sufficient to pass the "reasonable connection" standard at the jurisdictional stage.

Further, section 1605A(a)(1) required the provision of material support or resources to be "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." As set forth above, Bank Saderat, as an agency or instrumentality of Iran, was a serial participant in coordinating finances for Hezbollah and distributing funds to terrorist organizations in the West Bank, including Fatah Tanzim and AAMB. Iran and Bank Saderat's provision of support to these organizations would have required the approval of officials at the highest level of Iran's government. Accordingly, the material support provided here satisfies the jurisdictional requirements of 28 U.S.C. § 1605A(a)(1).

Thus, the elements for waiver of sovereign immunity under section 1605A are met and defendants are not entitled to sovereign immunity. Because all of section 1330(a)'s requirements for jurisdiction are satisfied, the Court possesses original jurisdiction over this matter.

## 2. Requirements for a claim to be heard

Section 1605A only applies if certain conditions are met: (1) the foreign state must have been designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to such act and remains so designated, (2) the claimant or victim must have been, at the time of the relevant act, a national of the United States, and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration. 28 U.S.C. § 1605A(a)(2).[16] Each of these conditions is met here.

First, Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). This designation meets section 1605A's definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited May 20, 2017). Because Iran was a designated state sponsor of terror at the time of the incident underlying plaintiff's claims and because it continues to be so designated, the first condition for a claim to be heard is met.

Plaintiff, suing in her individual capacity, meets the second requirement because Batsheva Shoham is a national of the United States. Section 1605A(h)(5) imports the definition of "national

---

[16] Though § 1605A(a)(2) enumerates other conditions, they are not relevant to this case.

of the United States" from 8 U.S.C. § 1101(a)(22), which defines the term as "a citizen of the United States, or a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(22). Plaintiff Batsheva Shoham is an American citizen, and therefore satisfies the condition that she be a "national of the United States" under section 1605A. However, as noted, Yehuda Shoham was not a citizen of the United States, and there was no evidence presented suggesting that he owed permanent allegiance to the United States. Accordingly, he was not a national of the United States under 28 U.S.C. § 1101(a)(22), and claims by his estate do not satisfy the conditions of section 1065A(h)(5).

Finally, plaintiff has met the third requirement because the "act" described in subsection (a)(1)—*i.e.* the act of extrajudicial killing—occurred in Israel, not the defendant state of Iran. Thus, plaintiff was not required by statute to afford defendants a reasonable opportunity to arbitrate.

### 3. Personal jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to section 1330(a) and (2) service has been properly made under section 1608 of the FSIA. 28 U.S.C. § 1330(b). As established above, the requirements for jurisdiction under section 1330(a) are met in this case. The Court next proceeds to an analysis of section 1608's requirements for service.

Section 1608(a) requires that service upon a foreign state be completed in one of four ways. 28 U.S.C. § 1608(a). The methods are presented in order of preference; a method of service must be unavailable or unsuccessful for a party to attempt service under a later method. *Id.* The first three methods are: (1) delivery of a copy of the summons and complaint in accordance with any special arrangement for service between plaintiff and the foreign state, (2) delivery of the same

documents in accordance with an applicable international convention on service of judicial documents, or (3) delivery of the same documents as well as a notice of suit, all translated into the foreign state's official language, by mail, return receipt requested. 28 U.S.C. § 1608(a)(1–3). The Court is not aware of any special arrangement for service between these parties and no international convention on service applies. Plaintiff was thus obligated to attempt service by mail, return receipt requested under § 1608(a)(3). That attempt was unsuccessful, and this Court authorized plaintiff to effect service by diplomatic channels under § 1608(a)(4).[17]

28 U.S.C. § 1608(a)(4) authorizes service as follows:

> [B]y sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(4). The Clerk of the Court certified mailing the specified documents, translated as required, to the State Department on March 18, 2013. ECF No. 30. The State Department subsequently confirmed transmission of the documents to the Iranian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of Switzerland in Tehran, Iran. ECF No. 40. The Court received confirmation that copies of the summons and complaint were delivered under cover of diplomatic note on April 21, 2013 to the Iranian Ministry of Foreign Affairs. *Id.* The Clerk entered default as to Iran on September 19, 2013, ECF No. 47. In light of these filings, the Court concludes that plaintiff has complied with section 1608(a)(4) and has,

---

[17] The details of plaintiff's attempts to serve defendants is more complicated and dealt with in greater depth in this Court's February 13, 2013 memorandum opinion and order. ECF Nos. 25 & 26. The Court need not revisit those issues here.

therefore, properly served defendant Iran in accordance with the FSIA. The Court may exercise personal jurisdiction over defendant Iran.[18]

Service on agencies or instrumentalities of foreign states, rather than the foreign states themselves, is governed by 28 U.S.C. § 1608(b). Subsection 1608(b)(3)(C) authorizes service to be made "by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state . . . as directed by order of the court consistent with the law of the place where service is to be made" provided service is "reasonably calculated to give actual notice." This Court previously found that plaintiff had unsuccessfully attempted to serve Bank Saderat via international registered mail in Iran and granted permission to attempt service against Bank Saderat at the address on record with OFAC. ECF Nos. 25 & 26. The Clerk of Court certified mailing the specified documents, translated as required, to Bank Saderat's office in Paris, France on August 5, 2014. ECF No. 61. The Court received confirmation that copies of the summons and complaint were delivered via Federal Express on August 8, 2014. ECF No. 62. This Court ordered entry of default by Order dated April 8, 2015. ECF No. 64. Default was entered the following day. ECF No. 65. In light of these filings, the Court concludes that plaintiff has complied with section 1608(b) and has, therefore, properly served defendant Bank Saderat in accordance with the FSIA.

Further, no minimum contacts analysis is required. Though the minimum contacts threshold for personal jurisdiction clearly does not apply to foreign state defendants like Iran, this is not always the case with an agency or instrumentality. The question turns on whether the foreign

---

[18] The Court also notes that no minimum contacts threshold must be met as to defendant Iran, either as a matter of constitutional or customary international law. *See Valore*, 700 F. Supp. 2d at 70–71 (concluding that Iran, as a foreign state, was not protected by the Fifth Amendment's Due Process Clause and that customary international law did not come into play because it cannot prevail over a contrary federal statute). Satisfaction of section 1330(b) is all that is required for assertion of personal jurisdiction over defendants.

state in question exercised sufficient, plenary control over the entity to make it an agent of the state—one that is "barely distinguishable from an executive department of the government." *See TMR Energy Ltd v. State Prop Fund of Ukraine*, 411 F.3d 296 301-02 (D.C. Cir. 2005); *Valore*, 700 F. Supp. 2d at 71.

In *TMR Energy*, the State of Ukraine had plenary control over the State Property Fund, which had been created to implement Ukraine's privatization plan following the dissolution of the USSR, because the Fund's operations were funded and regulated by, and its leaders were chosen by, the State. Here, Bank Saderat was nationalized by the Iranian government in 1979 and has operated as a state-run bank since. It is funded, regulated by, and primarily owned by Iran or persons and entities under control of the Iranian government. Further, it is used by the Iranian government to further state policies of supporting and funding terrorist organizations around the world. The Court therefore finds that Iran exercises sufficient control over Bank Saderat to make it an agent of the state, barely distinguishable from an executive department of the government of Iran. As a result, no further minimum contacts analysis is required, and the Court may exercise personal jurisdiction over defendant Bank Saderat based solely on service under 28 U.S.C. § 1330.

## B. Timeliness

Section 1605A includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained." 28 U.S.C. § 1605A(b). This Court has held that section 1605A's limitations provision is not jurisdictional. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 328 (D.D.C. 2014). Nonetheless, the Court shall briefly explore the matter because it concludes that plaintiff has complied with the statute of limitations regarding some—but not all—relief sought here.

Section 1605A(b) provides that an action may be brought "not later than . . . 10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b)(2). Plaintiff's complaint includes several causes of action, including assault, wrongful death and survivorship claims for the death of Yehuda Shoham, and intentional (IIED) and negligent (NIED) infliction of emotional distress caused by the injury and death of Yehuda. Compl. 40-45. "The statute of limitations on a tort claim ordinarily begins to run when the plaintiff sustains a tortious injury . . . ." *Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (quoting *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 546 (D.C. 2002)). Accordingly, the attack giving rise to this action occurred on June 5, 2001, and Yehuda Shoham died six days later on June 11, 2001. Plaintiff's cause of action for assault arose on the date of the assault: June 5, 2001.

Similarly, survivorship claims accrue in the decedent's favor before his death, and may be brought after his death by his estate. *See* RESTATEMENT (SECOND) OF TORTS § 926; D.C. Code § 12-101. Such claims do not arise from the death, but from the injury itself. *Greater Se. Community Hosp. v. Williams,* 482 A.2d 394, 397 (D.C. 1984).[19] "Accordingly, a survival action generally accrues on the date of the decedent's injury, and not on the date of the decedent's death." *Arrington v. District of Columbia*, 673 A.2d 674, 678 (D.C. 1996) (citation omitted). Thus, any survival action here also accrued on the date of Yehuda's injuries: June 5, 2001.

Claims for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Futrell v. Dep't of Labor Fed. Credit Union,* 816 A.2d 793, 808 (D.C. 2003). Negligence cases require a different showing of (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was

---

[19] Such claims often include pain and suffering resulting from assault, battery, or IIED.

proximately caused by the breach. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). Here, the conduct complained of—whether it constitutes extreme and outrageous conduct or merely breach of a duty—is the rock-throwing attack, and the injury at issue is the "extraordinary grief and mental anguish . . . [caused by] the *serious injury* and death upon [Batsheva Shoham's] child, Yehuda Shoham." Compl. 43 (emphasis added). Because Batsheva Shoham sustained tortious injuries—*e.g.* grief, mental anguish, etc—at the time Yehuda was first injured, the IIED/NIED claim also accrued on the date of the attack: June 5, 2001. To be timely then, plaintiff must have filed claims for assault, survivorship, or IIED/NIED by June 5, 2011

Finally, claims for wrongful death are based on the death itself, and not the underlying injuries that may have caused that death. Indeed, D.C. Code § 16-702 clearly states that the statute of limitations for wrongful death actions in D.C. begins "after the death of the person injured." Accordingly, this claim arose on the date of Yehuda's death: June 11, 2001. To be timely, plaintiff must have filed a claim for wrongful death by June 11, 2011.

Plaintiff filed this action on April 2, 2012, more than 10 years from the date any cause of action arose. However, Shoham had originally filed her claims as part of a separate case—*Binyamin Pilant et al. v. Islamic Republic of Iran et al.*, Case No. 1:11-cv-1077—before Judge Collyer. Judge Collyer filed an order [ECF No. 45] dated February 28, 2012 dismissing all claims other than those brought by the Pilant family and ordering those claims refiled within 30 days as separate cases. Those claims—including those of Batsheva Shoham—relate back to the original filing date in the *Pilant* case: June 9, 2011.

It appears that plaintiff's claims for assault, survivorship, and IIED/NIED were filed just four days outside the 10-year statute of limitations. Therefore, they are untimely. However, because the wrongful death claim was filed before June 11, 2011, that claim is timely. Accordingly,

because the wrongful death claim is timely under section 1605A of the FSIA, the Court will proceed as to defendants' liability.

## C. FSIA Liability

The state sponsored terrorism exception provides a private right of action. The action is available to, among others, nationals of the United States and the legal representatives of such persons. 28 U.S.C. § 1605A(c). Foreign states that meet subsection (a)(2)(A)(i)'s requirements as state sponsors of terrorism may be held liable under subsection (c). *Id.*

Section 1605A's private right of action has four basic elements. A plaintiff must prove: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused personal injury or death (4) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A (a)(1), (c).

### 1. Threshold determination of plaintiff's and defendants' statuses

The Court first determines whether the parties are such that subsection (c)'s cause of action may be pursued.

#### a. *Defendants are state sponsors of terrorism*

Defendants, for the reasons stated above in Part III.A.2, are state sponsors of terrorism within the meaning of 28 U.S.C. § 1605A(a)(2)(A)(i) and may be held liable.

#### b. *Entitlement of plaintiff to bring section 1605A(c) action*

Plaintiff here may pursue section 1605A(c)'s private right of action. Batsheva Shoham is a citizen of the United States and, therefore, falls within subsection (c)(1)'s ambit. However, Yehuda Shoham was not himself a United States national, and is not entitled to bring suit under

the FSIA. Accordingly, Batsheva Shoham may only recover individually and not as the administrator of Yehuda's estate

### 2. Act

For the reasons stated in Part III.A.1.a, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under section 1605A(c). Specifically, the evidence establishes that acts of extrajudicial killing were committed by a member of Fatah Tanzim and that a reasonable connection exists between the rock-throwing attack here and material support that defendants provided to Fatah Tanzim to encourage and incite such attacks.

### 3. Actor

Defendants may only be held liable under section 1605A(c) if the acts of extrajudicial killing were committed or the provision of material support made by defendants themselves or by their agents. 28 U.S.C. § 1605A(c). The facts found by the Court show that Iran and Bank Saderat, an agency or instrumentality of Iran, provided organizational support and funding to Hezbollah, Fatah Tanzim, and AAMB, as well as the members of those organizations. Therefore, Iran itself is treated as having provided material support to Fatah Tanzim and AAMB

### 4. Theory of recovery—causation and injury

Plaintiff alleges defendants are liable based on the provision of material support and resources for acts of extrajudicial killing, namely rock-throwing attacks. The elements of causation and injury under section 1605A(c) require plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). While section 1605A(c) requires courts to determine the substantive basis for

liability arising under it, the court is not given the authority (or duty) to articulate "federal common law." *Valore*, 700 F. Supp. 2d at 76. Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are instructed to "find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c). *Id.* Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. *Oveissi*, 879 F. Supp. 2d at 54 (quoting *In re Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

As discussed above, plaintiff seeks to recover economic damages arising from Yehuda's wrongful death, as well as non-economic survival damages for Yehuda's pain and suffering prior to his death, non-economic damages for the assault on Batsheva Shoham and Yehuda Shoham, and non-economic solatium damages for IIED or NIED. Compl. 40-45. Plaintiff also seeks punitive damages, as allowed by 28 U.S.C. § 1605A. *Id.* Finally, plaintiff seeks to recover damages arising from violations of the Torture Victims Protection Act (TVPA), Pub. L. 102-256, 106 Stat. 73. *Id.* The Court will consider these theories of recovery below.

For the reasons discussed above, the estate of Yehuda Shoham is not entitled to bring suit under 28 U.S.C. § 1605A. Accordingly, the claims brought by the estate of Yehuda Shoham— including survivorship and assault claims—will be dismissed. The Court will consider only the theories of recovery as to Batsheva Shoham individually.

### a. Wrongful death

Plaintiff seeks recovery for economic losses arising from the wrongful death of Yehuda Shoham, pursuant to 28 U.S.C. § 1605A and the wrongful death statute for the District of Columbia D.C. Code § 16-2701.[20] According to D.C. law:

> When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married or domestic partnered, entitle the spouse or domestic partner, either separately or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

*Id.* "In other words, a decedent's heirs may pursue claims for "economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 82. Such losses include the "1) . . . the loss of financial support the decedent could have been expected to provide the next of kin had he lived; and (2) the value of lost services (*e.g.*, care, education, training, and personal advice)." *Herbert v. D.C.*, 808 A.2d 776, 778 n. 2 (D.C. 2002).

It is axiomatic that acts of terrorism under section 1605A—including extrajudicial killing or material support thereof—are, by definition, wrongful. Any deaths resulting from an act of terrorism under section 1605A are properly considered wrongful deaths, and a plaintiff's recovery under a wrongful death theory of liability is appropriate. Thus, where a foreign state or an agency/instrumentality thereof is liable for an extrajudicial killing, or the provision of material

---

[20] Consistent with prior opinions by this Court, such claims are construed as being pled under § 1605A and not the D.C. Code, as consideration solely under the D.C. Code would preclude recovery based on geographic limitation to injuries occurring "within the limits of the District." D.C. Code § 16-2701(a); *Valore*, 700 F. Supp. 2d at 82.

support thereof, it may be liable for the economic damages experienced by the decedent's heirs under the D.C. Code and the FSIA. *Id.*

Critically, however, plaintiffs must establish that the wrongful death was *caused* by defendant's conduct. 28 U.S.C. § 1605A(a)(1), (c); D.C. Code § 16-2701(a). While the Court previously addressed the issue of jurisdictional causation—which is governed by the "reasonable connection" standard—it has not yet addressed whether the plaintiff has provided proof satisfying the substantive cause of action. *Cf. Kilburn*, 376 F.3d at 1129 (suggesting that satisfaction of jurisdictional causation standard for § 1605A does not necessarily satisfy the attendant causation standard for the underlying substantive theory of liability). The Court will therefore assess whether Shoham has provided sufficient evidence to satisfy the substantive cause of action for wrongful death.

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotation marks omitted). As noted above, the specific conduct complained of here is the provision of material support and resources to Fatah Tanzim, AAMB, and al-Manar to encourage and incite rock attacks against Israelis. Therefore, plaintiff was required to prove that the consequences of this material support—*i.e.* the death of Yehuda Shoham at the hands of Muayid Kafina—was reasonably certain, or more likely than not, to occur as a result of the material support provided. *Id.*

The evidence presented failed to establish causation to the satisfaction of the Court. That is, the Court is not satisfied that the evidence presented shows that defendants' support of Fatah Tanzim, AAMB, or al-Manar made Muayid Kafina's attack on the Shohams more likely than not to occur. Put another way, it is unclear that Muayid Kafina attacked the Shohams *because* he was a member of Fatah Tanzim, or because of material support provided to the organization by Iran and Bank Saderat. Though he admitted to being a member of Fatah Tanzim, there is simply no evidence that Kafina received direction, funding, or support from anyone to perpetuate the attack, including Iran or Bank Saderat. In fact, he stated in his confession that Israeli settlers had thrown stones at him during a trip with Sakar Saleh, and that afterwards he, Mahmud Ibrahim Khatib, Muhamad Bik, and Sakar Saleh met in a mosque and decided to "go out and throw stones on the cars of settlers." June 17 Kafina Statement. There was no evidence presented that the group comprised a Fatah Tanzim terrorist cell, or that any of the other rock throwers on June 5, 2001 were members of Fatah Tanzim or another terrorist organization. Further, there was no evidence presented that Fatah Tanzim, or any other group, helped coordinate that meeting, or fund, organize, or perpetuate the attack. In fact, there is no evidence that Kafina—the only known member of a terrorist organization present at the time—was leading the meeting or convinced the others to throw stones.[21] There was no evidence before this Court that Fatah Tanzim, AAMB, or any other terrorist organization even claimed responsibility for the attack. Nor was there evidence that this attack was planned or perpetuated by Kafina in his capacity as a member of Fatah Tanzim.

---

[21] Though the Court previously found that it is likely that Kafina's group was likely the one responsible for hitting the Shoham's vehicle, it is not clearly established that Kafina *himself* threw the rock that hit the vehicle and killed Yehuda Shoham. Assuming arguendo that another person in Kafina's group threw the rock that killed Yehuda, there would be even less of a connection between the attack and Fatah Tanzim unless there is evidence that Kafina himself lead or otherwise prompted the group to throw stones. But the Court has seen no such evidence. This further attenuates the connection between the attack and Fatah Tanzim, and ultimately between the attack and defendants Iran and Bank Saderat.

There was also no evidence presented that Kafina was motivated or incited by al-Manar programming to throw rocks at Israelis. Nor was there evidence that Fatah Tanzim or AAMB officials used al-Manar to direct rock-throwing attacks in the relevant area. Indeed, this Court received no evidence that Kafina had ever even watched al-Manar or viewed programming encouraging rock-throwing attacks. Though plaintiff's expert did testify that al-Manar was broadcast in the area where Kafina resided, the Court cannot reasonably infer that he watched al-Manar, or that he viewed any particular programming encouraging rock-throwing attacks, or that any such programming influenced his decision to attack the Shohams on June 5, 2001.

Finally, there was no evidence presented that Kafina, his family, or any of the other rock throwers have received benefits from the Martyrs Foundation or any other organization as compensation for conducting an attack against Israelis. There is also no evidence suggesting that Kafina or his group was motivated to throw rocks at Israelis to collect on the bounty established by that fund, or that they expected to be compensated in any way.

The Court pauses to note, however, that it is deeply troubled by the conduct alleged here regarding Iranian support of the Martyrs Foundation, or of any similar organization, for the purpose of encouraging attacks on Israelis. To be clear, plaintiff suggests that defendants funnel money to foundations with the intent of encouraging violent attacks by compensating the attacker for services rendered. As far as the Court can recall, this is the first time such conduct has been presented. If true—as plaintiff suggests—this is the functional equivalent of a foreign state laying a bounty on the heads of Israelis. According to plaintiff, payment—blood money—is made to the families of attackers regardless of whether those killed are innocent civilians, tourists in a local market, or perhaps even an infant child traveling with his parents. A foreign state setting functional bounties on the heads of civilians is indistinguishable from the direct solicitation of murderers or

terrorists for hire, and strikes this Court as a particularly devious state policy that certainly rises to the level of material support of acts of extrajudicial killing under section 1605A. This Court would find no difficulty in extending FSIA liability to any foreign state, political subdivision, or agency or instrumentality thereof, who enact such policies and cause personal injury or death as a result. In short, if the evidence presented to the Court established a causal link between such payments and a terrorist attack, the Court would not hesitate to hold the appropriate parties liable.

However, as noted here, the Court is not convinced, based on the evidence presented, that the Martyrs Foundation, or any other fund, caused the June 5, 2001 attack on the Shohams. Ultimately, there was no evidence presented that Kafina accepted, or even sought payments from any organization after the attack. There was no evidence presented that the attack utilized *any* resources, monetary or otherwise, of Fatah Tanzim or AAMB. Thus, it remains unclear to the Court whether Kafina's membership in Fatah Tanzim was actually a reason for his participation in the attack. In other words, the Court is unsatisfied that the attack is fairly attributable to Fatah Tanzim or AAMB, and therefore to Iran or Bank Saderat, or whether it is more accurately characterized as senseless violence or criminal malfeasance.

In other cases before this Court, the responsibility of a terrorist organization for the attack is relatively clear, backed up by reports and testimony from experts, police, and intelligence officials. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 388 (D.D.C. 2015) (where it was clear that Hamas was responsible for a suicide bombing in which there was a videotape confession of the bomber, the bomber's father described his son as being a member of Hamas, and two members of Hamas were arrested for helping the bomber identify the target and getting him to the target); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006) (finding Hamas responsible for the same attack because the attacker was a member and

"[s]ubsequent confessions and other statements to Israeli police and news organizations verified that Hamas was responsible for the attack"); *Eisenfield v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 4 (D.D.C. 2000) (where a passenger on a bus denoted a bomb "at the direction of Hamas" after joining Hamas, meeting with representatives in Tehran, and training for months with Iranian officials outside a military base in Tehran, and Hamas "immediately claimed credit); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002) (same); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006) (same); *Peterson I,* 264 F. Supp. 2d 46, 53-54 (D.D.C. 2003) (where Iran's complicity in the Beirut bombing was extensively documented, in part by intercepted messages from Tehran directing Islamic Amal, and later Hezbollah, to instigate attacks against Marines in Lebanon); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 261-62 (D.D.C. 2003) (Urbina, J.) (where Hamas members carried out suicide bombings and members of their Hamas cell "gave Israeli authorities a detailed account of the planning, funding, and execution" of the attack). This case is different. The evidence was supplied largely by three experts: the Israeli police investigator who investigated the attack, a historian, and a policy fellow with expertise in terrorist financing and media. While the Court is exceedingly grateful for their testimony, the evidentiary record here is relatively thin in comparison to other cases previously before this Court.

At bottom, Muayid Kafina—and his membership in Fatah Tanzim—is the only apparent link between the June 5, 2001 attack and defendants Iran and Bank Saderat. Yet plaintiff's own evidence suggests differing reasons for the attack. Specifically, Kafina stated that he decided to throw rocks (1) "because of the security situation" in the West Bank and (2) in retaliation for having rocks thrown at him by Israeli settlers. Aweeda Deposition 18:1-3; June 17 Kafina Statement. The evidence does not show, and the Court cannot infer, that Iran and Bank Saderat's

funding of Fatah Tanzim, AAMB, or al-Manar made the June 5, 2001 attack reasonably certain, or more likely than not to occur. In the Court's estimation, based on the evidence before it, it is just as likely that Kafina decided to throw rocks in retaliation for having rocks thrown at him by Israeli settlers. While it appears undeniable that Iran and Bank Saderat provide material support to Fatah Tanzim, AAMB, and al-Manar, there was simply no evidence presented to the Court that such material support caused Kafina, or the other rock throwers, to attack the Shohams on the night of June 5, 2001. Accordingly, the Court is not satisfied that the evidence presented establishes a right to relief, and 28 U.S.C. § 1608(e) precludes this Court from entering default judgment.

### b. Intentional and/or negligent infliction of emotional distress

At the outset, the Court notes that plaintiff's IIED and NIED claims are untimely for the reasons discussed in Part III.B. However, the Court will outline the claims below.

Under the laws of the District of Columbia, plaintiff may recover for negligent infliction of emotional distress under two tests. "The well-established 'zone of danger' test allows a plaintiff to recover 'for mental distress if the defendant's actions caused the plaintiff to be 'in danger of physical injury' and if, as a result, the plaintiff 'feared for his own safety.'" *Lesesne v. District of Columbia*, 146 F. Supp. 3d 190, 195 (D.D.C. 2015) (quoting *Hedgepeth*, 22 A.3d 789, 796 (D.C. 2011) (en banc)). "Alternatively, the D.C. Court of Appeals permits NIED claims when a plaintiff was not within the zone of danger but where there is a 'special relationship' between the parties." *Id.*

While Batsheva was certainly within a zone of danger at the time of the attack, she appears not to have been in any fear for her own safety at the time of the attack. Batsheva Shoham testified that she had been sleeping in the backseat with Yehuda when the rock attack came through the windshield. Batsheva Testimony 17:11-18-12. While she was sleeping, she heard a loud noise that

woke her up, but it was dark and she did not know what had happened until Binyamin pulled over and turned on the lights. *Id.* Accordingly, the Court finds that Batsheva did not fear for her own safety and cannot recover under a "zone of danger" NIED theory.

Alternatively, the Court is not aware of any special relationship between Batsheva Shoham and Muayid Kafina such that a duty existed to avoid negligent conduct that would cause serious emotional distress. Accordingly, the Court finds that plaintiff has not provided adequate evidence to justify a finding of liability under a "special relationship" NIED theory either. However, this is not a case of negligent conduct, but rather intentional conduct. The proper focus then is plaintiff's claim of solatium damages for defendants' intentional infliction of emotional distress.

Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in section 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser*, 659 F. Supp. 2d at 26 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)). This Court has previously held that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Valore*, 700 F. Supp. 2d at 77; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing RESTATEMENT (SECOND) OF TORTS § 46(2)(a)). The "immediate family" requirement is strictly construed in FSIA cases; generally, only

spouses, parents, siblings, and children are entitled to recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

Here, Batsheva Shoham was present for both the attack and the death of her son, and there is no doubt that severe emotional distress did—and continues to—result. Also, the evidence establishes that Iran and Bank Saderat intentionally provided material support to Hezbollah, Fatah Tanzim, and AAMB with the intent to support, encourage, and incite attacks like the one that killed Yehuda Shoham. However, for the reasons discussed in Part III.C.4.a, plaintiff has failed to establish substantive causation between defendants' general support of Fatah Tanzim, AAMB, and al-Manar, and the June 5, 2001 attack. Accordingly, the Court is not satisfied that the evidence presented establishes a right to relief, and 28 U.S.C. § 1608(e) precludes this Court from entering default judgment.

### c. Torture Victims Protection Act

The TVPA provides a cause of action for civil suits against individuals who commit, aid, or abet acts of torture or extrajudicial killing. Specifically, the TVPA provides

> An individual who, under actual or apparent authority, or color of law, of any foreign nation—
> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> > (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Pub. L. 102-256, 106 Stat. 73, § 2(a). While the Act defines "torture" and "extrajudicial killing," it does not define "individual." [22] The Supreme Court has determined that the ordinary meaning of that word, and the statutory context of the TVPA language, evinces Congress' intent to extend liability under the TVPA "solely against natural persons." *Mohamad v. Palestinian Authority*, 566 U.S. 449, 132 S. Ct. 1702, 1708 (2012). In doing so, the Supreme Court expressly rejected an application of the TVPA toward an "organizational entity" such as the Palestinian Authority, despite the likelihood that it would foreclose remedies for victims and their families. *Id.* at 1710.

Plaintiff's claims here lie solely against the Islamic Republic of Iran and Bank Saderat. Truly there can be no entity more "organizational" than a nation state, or the instrumentality or agency thereof. The Court sees no basis for distinguishing this case or departing from the Supreme Court's construction of the TVPA that "Congress did not extend liability to organizations, sovereign or not." *Id.* at 1710 (emphasis added). "There are no doubt valid arguments for such an extension. But Congress has seen fit to proceed in more modest steps in the [TVPA], and it is not the province of [the Judicial] Branch to do otherwise." *Id.* at 1711. Accordingly, a theory of liability by which plaintiff seeks to recover against a sovereign nation under the TVPA must fail. Plaintiffs may not pass TVPA claims through 1605A to recover against organizational entities.

Because plaintiff's claims are solely against organizational entities, this Court is unable to grant default judgment. Those claims will be dismissed.

---

[22] "Extrajudicial killing" means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." § 3(a). "Torture" means "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." § 3(b).

### d. Assault

Section 1605A extends liability for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act by a foreign state. Thus, a plaintiff who suffers an assault or battery from—but is not killed by—such an act may still recover under 1605A. Plaintiff's claims here include those for personal injury to herself as a result of assault. Compl. 42. Again, for the reasons stated in Part III.B, Batsheva Shoham's individual claims for assault resulting from the June 5, 2001 attack are untimely. However, the Court will again outline the claim.

A defendant is liable for assault if, when it provided material support committed extrajudicial killing or provided material support and resources therefor, (1) it acted "intending to cause a harmful contact with . . . or an imminent apprehension of such a contact" by those attacked and (2) those attacked were "thereby put in such imminent apprehension." *Valore*, 700 F. Supp. 2d at 76 (quoting RESTATEMENT (SECOND) OF TORTS § 21(1)). While it is clear that the attackers acted with intent to cause harmful contact or the imminent apprehension thereof, it is also clear that Batsheva Shoham did not actually suffer such apprehension. As noted above, Batsheva Shoham testified that she had been sleeping in the backseat with Yehuda when the rock attack occurred. Batsheva Testimony 17:11-18-12. While she was sleeping, she heard a loud noise that woke her up, but it was dark and she did not know what had happened until Binyamin pulled over and turned on the lights. *Id.* Accordingly, Batsheva did not suffer any apprehension, and the claims for assault must be dismissed.

Further, as with the IIED/NIED claims, plaintiff has failed to establish substantive causation between defendants' general support of Fatah Tanzim and the June 5, 2001 attack.

Accordingly, the Court is not satisfied that the evidence presented establishes a right to relief, and 28 U.S.C. § 1608(e) precludes this Court from entering default judgment.

### 5. Jurisdiction

For the reasons laid out above in Part III.A.1, the Court "may maintain jurisdiction" over this suit. However, in light of plaintiff's failure to satisfy of 28 U.S.C. 1605A(c)'s requirements to the satisfaction of this Court, the Court concludes that defendants may not be held liable under the basis of the FSIA or the underlying theories of recovery contained in the complaint.

### D. Liability Under Non-Federal Law

In Counts III and IV of her complaint, plaintiff pleads claims for assault and IIED action arising under *both* section 1605A's private right of action and "federal and state common law." Compl. 42-43. Section 1605A(c) authorizes recovery for "personal injury or death caused by acts [of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act]." However, as noted, plaintiff has failed to establish claims for common law assault, and has failed to provide evidence satisfactory to the Court as to substantive causation for *any* of her claims, including IIED/NIED or assault. Further, this Court is unaware of a causation standard that would allow recovery under *either* federal or state common law. Accordingly, federal and state common law provide no additional theories of liability upon which this Court may grant default judgment. Those too will be dismissed.

### E. Damages

The Court is unable to reach the issue of individual economic and non-economic damages sustained by plaintiff based on the record and failure of the evidentiary record to establish defendants' liability. While no amount of damages can truly compensate the family of a murdered child for the magnitude of their loss, the Court regrets that it is unable to attempt to compensate

plaintiff for the agony she has endured. But the rule of law is not a rubber stamp. This Court is duty-bound to scrutinize the claims and evidence before it, and plaintiff's burden is to satisfy the applicable legal standards set forth under the FSIA and the laws of the United States and the District of Columbia. As presented to this Court, they do not.

Further, plaintiff's requested relief includes punitive damages in the amount of $300,000,000.00. Punitive damages are explicitly made available under section 1605A's cause of action for the purpose of punishing and deterring foreign states from engaging in or materially supporting terrorism. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (internal citation omitted). One additional factor is relevant: in situations where punitive damages have been awarded repeatedly against a defendant for the same conduct in a series of lawsuits, the Court should consider whether to limit such damages so as not to over-punish that defendant for that particular conduct. *See Murphy*, 740 F. Supp. 2d at 81. In cases where this factor has been salient, the Court has tied punitive damages to compensatory damages by applying a multiplier to the amount of compensatory damages awarded. *Id.* at 81–83.

However, any finding of damages is predicated on a finding of liability "for personal injury or death caused by acts [of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act]." 28 U.S.C. § 1605A(c). Though this Court has determined that Iran and Bank Saderat have materially supported terrorism in this and in previous holdings, plaintiff has failed to provide satisfactory evidence as to causation in this particular case. Therefore, despite the abhorrent and deplorable conduct of Iran and Bank Saderat

in encouraging and inciting attacks like the ones suffered by the Shohams, this Court lacks the legal authority to impose punitive damages or levy any deterrence against Iran for its continued indecency and inhumanity. Suffice to say that this Court regrets that it is unable to do so.

## V. CONCLUSION

In sum, although plaintiff's evidence clearly establishes links between Iran, Hezbollah, Fatah Tanzim, and AAMB, the FSIA requires plaintiffs to establish causation between a defendant's conduct and plaintiff's damages. For the reasons discussed above, the Court determines that the evidence before it is insufficient to find defendants Iran and Bank Saderat caused the June 5, 2001 attack that resulted in the death of Yehuda Shoham and injuries to his family. Because 28 U.S.C § 1608(e) provides that no default judgment may be entered against a foreign state, or an agency or instrumentality of a foreign state, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court," this Court cannot issue judgment.

Accordingly, this case shall be dismissed with prejudice.

A separate order shall issue this date.

Royce C. Lamberth
United States District Judge

DATE: 6/1/17